**MARK MESSINA**, *et al.*,

     *Plaintiffs,*

*v.*

**CITY OF FORT LAUDERDALE, FLORIDA**,
*a Florida municipal corporation*,

     *Defendant.*

_____/

## ORDER

Mark Messina and Bernard McDonald are men of limited means. To survive, they hold signs and panhandle in the City of Fort Lauderdale—sometimes on sidewalks, sometimes along public roads. The City enacted (and its police have been enforcing) two ordinances that chill these activities. The first ordinance bans solicitation in designated areas—at bus stops and garages, for instance, or near ATMs and sidewalk cafés—and it prohibits so-called "aggressive panhandling" anywhere within the City's limits. The second ordinance makes it illegal to solicit donations along certain arterial roads—including via hand-to-hand exchanges with motorists—and it forbids canvassers from standing on those roads and holding signs that violate the City's sign regulations. Both ordinances are punishable by fines and imprisonment.

Messrs. Messina and McDonald (our Plaintiffs) have sued the City under 42 U.S.C. § 1983 for past and ongoing injuries to their rights under the First Amendment to the U.S. Constitution. As redress, they've asked us to enjoin both ordinances. After a hearing and a careful review of the record, we conclude that the Plaintiffs are likely to succeed on the merits of their claims and that they've satisfied the other requirements for preliminary injunctive relief. We therefore **GRANT** their motion for a preliminary injunction.

In May 2012, the Fort Lauderdale City Commission enacted Ordinance No. C-12-10, which it later codified as § 16-82 of the City Code (we'll refer to this Ordinance as "§ 16-82" or the "Panhandling Ordinance"). *See* Complaint [ECF No. 1] ¶ 1. About two-and-a-half years later, the Commission enacted Ordinance No. C-14-38, which it later codified as § 25-267 of the City Code (we'll refer to this Ordinance as "§ 25-267" or the "Right-of-Way Ordinance"). *Id.* ¶ 22. These are the two Ordinances the Plaintiffs challenge in this case, so we'll take a moment to describe each in detail.[1]

The Panhandling Ordinance bans two activities. *First*, it prohibits "panhandling" in certain *kinds* of locations throughout the City—at bus stops and transportation facilities; in parking lots and City parks; anywhere within 15 feet of sidewalk cafés, ATMs, or entrances to commercial or government buildings; and on private property. § 16-82(b). The Ordinance defines "panhandling" as any request for "an immediate donation of money or thing of value," or an exchange in which one person receives an item of "little or no monetary value in exchange for a donation," such that "a reasonable person would understand that the transaction is in substance a donation." § 16-82(a). Panhandling *doesn't* include "passively standing or sitting, performing music, or singing with a sign or other indication that a donation is being sought, but without any vocal request other than a response to an inquiry by another person." *Id.*

*Second*, the Panhandling Ordinance forbids "aggressive panhandling" *anywhere* within City limits. § 16-82(c). "Aggressive panhandling" is a form of panhandling that includes the following: (1) approaching someone in a manner that would lead a "reasonable person to believe" that he is "being threatened with either imminent bodily injury or the commission of a criminal act upon the person"; (2) requesting a donation after a person has "given a negative response to the initial request"; (3)

---

[1] For full-text versions, see Appendices A & B. Both Ordinances and the entire City Code are available at https://library.municode.com/fl/fort_lauderdale/codes/code_of_ordinances.

blocking individuals or groups from passage; (4) touching another without permission; or (5) "[e]ngaging in conduct that would reasonably be construed as intended to intimidate, compel or force a solicited person to accede to demands." § 16-82(a).

Section 25-267, the Right-of-Way Ordinance, identifies and regulates a distinct category of panhandler whom the provision refers to as the "right-of-way canvasser or solicitor." This person does any of the following three things on a "right-of-way"[2]: he (1) sells items or services of any kind, or advertises for sale anything or service of any kind; (2) seeks a "donation of any kind"; or (3) "personally hands to or seeks to transmit by hand or receive by hand anything or service of any kind" to a motorist on any street or roadway, whether the motorist's vehicle is temporarily stopped or not. § 25-267(a). The Ordinance makes it illegal to act "as a right-of-way canvasser or solicitor"—that is, to engage in one of the three listed activities—on any portion of certain specified public rights-of-way. § 25-267(b). It's also illegal for a right-of-way canvasser "to hold, carry, possess or use any sign or other device of any kind, within any portion of the public right-of-way contrary to any of the terms and provisions of section 47-22, of the Unified Land Development Regulations." § 25-267(d).[3]

The penalties for violating the Panhandling Ordinance or the Right-of-Way Ordinance are set forth in § 1-6 of the City Code and include fines of up to $500, a term of imprisonment of up to 60 days, or both. § 16-82(d); § 25-267(f).

The Plaintiffs are residents of Broward County. *See* Complaint ¶¶ 7–8. They've either lived without permanent housing or struggled to pay for basic needs and expenses, and they rely on

---

[2] The term "right-of-way" is borrowed from § 25-97 of the City Code, and it means "the surface and space above and below any real property in which the city has an interest in law or equity, whether held in fee, or other estate or interest, or as a trustee for the public, including, but not limited to any public street, boulevard, road, highway, freeway, lane, alley, court, sidewalk, or bridge."

[3] Section 47-22 is the City's sign regulation, which is generally applicable on private property. *See* § 47-22-1(c) ("This section regulates the time, place and manner in which a sign is erected, posted, or displayed on private property[.]").

donations for their subsistence. *Id.* Mr. Messina solicits pedestrians for donations, typically on city sidewalks near commercial areas or outdoor cafés—though sometimes he stands on the medians or shoulders of roads to ask for donations from motorists who are temporarily stopped in traffic. *Id.* ¶ 36. He often holds a sign with a religious message and sometimes distributes pamphlets, hoping for donations in return. *Id.* ¶ 37. When Mr. Messina panhandles in the City, he is "regularly harassed by [City] officers who will drive up to where he is standing and yell at him to leave the area immediately and warn him that if they see him again, they will arrest him." *Id.* ¶ 38. On several occasions, he's seen the police arrest *other* panhandlers. *Id.* ¶ 39. Mr. Messina panhandles a few times a week and would like to do so more often, but he doesn't because of his fear of arrest. *Id.* ¶ 39.

Mr. McDonald likewise panhandles at several locations in the City, standing on sidewalks adjacent to the street or on the medians or shoulders of City roads. *Id.* ¶ 43. He displays a sign that reads "Homeless, please help me if you can," *id.*, and—like Mr. Messina—he's been "repeatedly harassed" and threatened with arrest by the police, *id.* ¶ 44. Those experiences have deterred him from panhandling more frequently. *Id.* ¶ 45.[4]

In this lawsuit, the Plaintiffs assert two counts under the First Amendment—one for each Ordinance—and ask for the following relief: (1) declarations that §§ 16-82 and 25-267 violate the First Amendment, facially and as applied to the Plaintiffs; (2) a preliminary and permanent injunction prohibiting the City from enforcing §§ 16-82 and 25-267; (3) money damages; and (4) attorneys' fees and costs. *Id.* ¶¶ 47–63.

---

[4] The Plaintiffs allege that, since 2018, more than 100 people have been arrested or cited with a notice to appear in court for violations of the two Ordinances, and they claim that "the predominant reason for [these] arrests or citations was solicitation of donations." *Id.* ¶ 33.

Soon after the Plaintiffs filed their Complaint, they moved for a preliminary injunction, arguing that they've been irreparably harmed by having their speech chilled and that preliminary relief is equitable insofar as the City has no valid interest in enforcing unconstitutional laws. *See generally* Motion for Preliminary Injunction ("Motion") [ECF No. 5]. The City subsequently moved to dismiss the Complaint for lack of subject matter jurisdiction, *see* Defendant City's Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion to Dismiss") [ECF No. 12], contending that the Plaintiffs lack Article III standing because (1) they haven't been arrested or cited for violating the Ordinances and (2) their general allegations of "harassment" don't suffice to state a concrete injury, *id.* ¶¶ 2–3. Nor, according to the City, can the Plaintiffs *really* allege that their speech has been "chilled" because (as they acknowledge) they continue to panhandle in the City. *Id.*[5]

After both motions were fully briefed,[6] the Court scheduled a preliminary injunction hearing and asked the parties whether they intended to call witnesses or present additional evidence. *See* Order [ECF No. 26]. The City submitted an excerpt of Mr. McDonald's deposition testimony from another case—which it used to challenge his Article III standing—and a copy of the sign ordinance, § 47-22. *See* Joint Notice [ECF No. 27]. In their Reply, the Plaintiffs sought to introduce an updated arrest report. *See id.* At the Hearing, we sustained the City's objection to this report—which, after all, the Plaintiffs had only submitted in Reply. *See* Apr. 9, 2021 Hr'g. The Plaintiffs also introduced copies of

---

[5] The City didn't challenge the Plaintiffs' standing to attack any of the Ordinances' *specific* provisions; it argued only that their speech hasn't been chilled *generally*—*i.e.*, that they haven't suffered any Article III injury. *See generally* Motion to Dismiss.

[6] *See* Defendant City of Fort Lauderdale's Response to Plaintiff's Motion for Preliminary Injunction ("Response") [ECF No. 11]; Plaintiffs' Reply to Defendant City of Fort Lauderdale's Response to Plaintiffs' Motion for Preliminary Injunction ("Reply") [ECF No. 21]; *see also* Plaintiffs' Response and Memorandum of Law in Opposition to Defendant City's Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Response to Motion to Dismiss") [ECF No. 20]; Defendant City's Reply in Support of Motion to Dismiss ("Reply to Motion to Dismiss") [ECF No. 22].

the Ordinances, the arrest records, and a letter signed by various organizations asking the City Commission to repeal the Ordinances. *See* Motion, Exs. 1–6.

At the Hearing, we denied the City's Motion to Dismiss,[7] explaining that Article III standing is "loosened" for First Amendment challenges to laws that are broadly applicable to the public. *See Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001); *see also Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 762 n.5 (11th Cir. 1991) ("[T]he broader the first amendment right and . . . the more likely it is that a governmental act will impinge on the first amendment, the more likely it is that the courts will find a justiciable case when confronted with a challenge to the governmental act."). And we found that the Plaintiffs' specific claims of police harassment—coupled with their concrete allegations about personally seeing the police arrest *others* for panhandling—were more than sufficient to raise an inference that their speech had been chilled and that they'd suffered an injury in fact. *See generally* Apr. 9, 2021 Hr'g. Alleging standing at the pleading stage is, we noted, relatively easy. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "general factual allegations of injury" suffice at the pleading stage and that plaintiffs must substantiate general claims with "specific facts" *only* at later stages of the case); *see also Bennett v. Spear*, 520 U.S. 154, 171 (1997) (noting that the burden to *plead* standing is "relatively modest").

We noted, moreover, that the Plaintiffs didn't have to be arrested or prosecuted to raise a facial challenge to the Ordinances under the First Amendment; they only needed to do precisely as they did: allege that they (1) intended to engage in the banned activity and (2) faced a credible threat of prosecution. *See, e.g.*, *Pittman*, 267 F.3d at 1283–84 (holding that, to establish standing, "the plaintiff must show that he or she had an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of

---

[7] We later issued a written order to that effect. *See* Order Denying Motion to Dismiss [ECF No. 31].

prosecution" (cleaned up)). In other words, the Plaintiffs had only to demonstrate that their decision to refrain from protected speech was objectively reasonable—which is to say, that it wasn't an injury they'd manufactured. We also rejected the near-frivolous argument that the Plaintiffs' injury claims were belied by their decision to continue panhandling. *See* Apr. 9, 2019 Hr'g. The concept of "chilled speech," we explained, isn't an either-or proposition. *Id.* It doesn't require the Plaintiffs to cease their protected activities entirely—so long as they can show that they reduced *the frequency* of their speech *because of* a credible fear of arrest. *Id.* In that way, we held, the Plaintiffs suffered (and continue to suffer) an Article III injury.

At the argument on the Plaintiffs' request for a preliminary injunction, the City raised three new issues. *First*, it suggested that § 25-267(d) proscribes sign-holding only on *private* property, and not on public rights-of-way—though it eventually conceded that the provision was "poorly drafted" and, at best, ambiguous as to whether it applied on public or private land. Because City police officers were enforcing the provision on *public* sidewalks, though—and because the Plaintiffs often hold signs while panhandling on sidewalks—the City agreed to issue a memorandum directing its officers *not* to enforce that provision on *public* rights-of-way. *Second*, the City at least implied that the Plaintiffs lacked standing to challenge the aggressive panhandling provision in § 16-82 because they hadn't alleged that, as part of their panhandling activities, they routinely threaten, touch, or block pedestrians. *Third*, the City contended that the hand-to-hand clause in the Right-of-Way Ordinance was a distinct, content-neutral prohibition, which could be isolated from the other proscriptions and evaluated separately. Because the City hadn't advanced any of these arguments before, we invited supplemental briefing. Now that the parties have submitted those additional papers,[8] we address the Plaintiffs' Motion—and, for the following reasons, we **GRANT** it in full.

---

[8] *See* Plaintiffs' Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Supplemental Brief") [ECF No. 32]; Defendant City's Supplemental Response to

**STANDING**

As we've explained, at the Hearing—and after we'd found that the Plaintiffs had sufficiently alleged an Article III injury—the City launched a renewed attack on the Plaintiffs' standing to advance a facial challenge against the Panhandling Ordinance's "aggressive panhandling" provisions. Specifically, the City claimed that the Plaintiffs lacked standing to pursue that aspect of their claims because they failed to allege that they engaged (or intended to engage) in conduct that falls within the ambit of those provisions—intimidating pedestrians, for example, or touching others without consent. *See* Apr. 9, 2021 Hr'g. The City didn't say much more on the subject; nor has it briefed the issue, either before or after the Hearing. *See generally* Motion to Dismiss; Supplemental Response. We address it anyway, though, because it's "the Court's responsibility to 'zealously insure that jurisdiction exists over a case.'" *Sully v. Scottsdale Ins. Co.*, 2021 WL 1289618, at *6 (S.D. Fla. Apr. 7, 2021) (Altman, J.) (quoting *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001)).

"When an individual is subject to [the threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). So, a person may bring a pre-enforcement suit when he "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]" *Id.* (citation omitted); *see also ACLU v. The Florida Bar*, 999 F.2d 1486, 1494 & n.13 (11th Cir. 1993) (explaining that a plaintiff must have an objectively reasonable belief about the likelihood of disciplinary action).

The Plaintiffs (it's true) haven't alleged that they intend to intimidate pedestrians or to touch others without consent. *See generally* Complaint. But it's still reasonable to infer—at least at this stage

Plaintiff's Motion for Preliminary Injunction ("Supplemental Response") [ECF No. 40]; Plaintiffs' Reply to Defendant City of Fort Lauderdale's Response to Plaintiffs' Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Supplemental Reply") [ECF No. 47].

of the case—that (1) they want to do certain things the "aggressive panhandling" provisions arguably forbid, *and* that (2) their speech has been chilled because they fear prosecution. So, for example, by standing on a narrow sidewalk and asking strangers for donations (even in areas not covered by § 16-82(b)), it's likely that the Plaintiffs will end up making a second request after a first refusal or that they'll accidentally "block" (or even touch) others on the sidewalk. And it's undisputed that the Plaintiffs *could* be subject to arrest in either of those scenarios. *See* § 16-82(a)(2), (3) (prohibiting second requests after initial refusal and penalizing panhandlers for "blocking" pedestrians). Unsurprisingly, then, the Plaintiffs allege that they (subjectively) fear arrest under both Ordinances. *See* Complaint ¶ 40. And, given the breadth of the "aggressive panhandling" provisions, their decision to chill their own speech seems reasonable in the circumstances. Indeed, the Plaintiffs allege that, while panhandling, police officers have harassed them and threatened them with arrest, *see id.* ¶¶ 38, 44, and that they've seen officers arrest *other* panhandlers, *see id.* ¶ 39—claims they've corroborated by appending to their Motion a stack of arrest and citation records, showing (they say) that the City's police officers continue to arrest panhandlers for violating the "aggressive panhandling" provisions. *See* Arrest Records [ECF No. 5-6] at 8, 14, 33 (citations for "aggressive panhandling").[9] The Plaintiffs, in short, have standing to advance their facial challenge to the "aggressive panhandling" provisions.

---

[9] This evidence of third-party arrests—together with the scope of the "aggressive panhandling" provisions—*may* bring this case within the ambit of the First Amendment's "overbreadth doctrine." That doctrine allows "a litigant whose own conduct is unprotected to assert the rights of third parties to challenge a statute, even 'as applied' to him the statute would be constitutional." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.13 (1984). If a plaintiff can show that the challenged law punishes a "substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep," the court may "invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression[.]" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (cleaned up). The Supreme Court has "provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Id.* at 119.

Because the Plaintiffs' activities are arguably proscribed by the "aggressive panhandling" provisions, and because—at this stage—the Plaintiffs have plausibly alleged a reasonable fear of

**PRELIMINARY INJUNCTION**

To prevail here, the Plaintiffs must establish that: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest. *See, e.g., Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). The first factor, "a substantial likelihood of success on the merits," requires a showing of "only *likely* or probable, rather than *certain*, success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). It's worth noting, too, that this first factor is "generally the most important" of the four. *Id.* One last thing on these factors: the third and fourth factors "'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez*, 978 F.3d at 1270–71 (quoting *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020)). And, of course, the Plaintiffs bear the burden of proving their entitlement to a preliminary injunction. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

## I.     LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  The First Amendment

The First Amendment, applicable to the States through the Fourteenth, prohibits the enactment of laws "abridging the freedom of speech." U.S. CONST. amend I. The City concedes, as it must, that panhandling is protected speech under the First Amendment. *See generally* Response; *see also*

---

prosecution, we don't need to dive into the murky waters of overbreadth standing. We note, though, that the "standing" concerns the City raised at the Hearing are perhaps better suited for a merits-based evaluation. *See Munson*, 467 U.S. at 958–59 ("The Secretary's [standing] concern . . . is one that is more properly reserved for the determination of Munson's First Amendment challenge on the merits. The requirement that a statute be 'substantially overbroad' before it will be struck down on its face is a 'standing' question only to the extent that if the plaintiff does not prevail on the merits of its facial challenge and cannot demonstrate that, as applied to it, the statute is unconstitutional, it has no 'standing' to allege that, as applied to others, the statute might be unconstitutional."). We, of course, address that merits question below. For now, though, it suffices to say that the Plaintiffs have standing to proceed through this initial phase of the case.

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (holding that a request for charity or gifts, whether "on the street or door to door," is protected First Amendment speech); *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) ("There is no question that panhandling and solicitation of charitable contributions are protected speech."); *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("Like other charitable solicitation, begging is speech entitled to First Amendment protection."). The City also acknowledges—or at least it doesn't contest—that both Ordinances regulate activities in "traditional public fora" (*e.g.*, sidewalks and public parks). *See generally* Response; *see also Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011) ("Traditional public fora are public areas such as streets and parks that, since 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983))).

The government may, of course, regulate protected speech in traditional public fora. But the legality of any such regulation turns on its justification and the degree to which the regulation is tailored to that justification. The state's burden in this regard depends on the regulation's features. If the law limits speech based on its communicative content—sometimes referred to as a content-based restriction—then it is subject to strict scrutiny. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Laws subject to strict scrutiny are "presumptively unconstitutional," which means that the government must prove that they are "narrowly tailored to serve compelling state interests." *Id.* By contrast, a regulation imposing reasonable and content-*neutral* restrictions—on the time, place, or manner of speech—must withstand only intermediate scrutiny, which requires *both* that the regulation be narrowly tailored to serve a significant governmental interest *and* that it "leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014); *see also Bloedorn*, 631 F.3d at 1231 ("[A] time, place, and manner restriction can be placed on a

traditional public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication." (cleaned up)).

So, how do we know if a law is content based or content neutral? Fortunately, the Supreme Court recently answered this question in *Reed*. A regulation of speech is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. In so holding, *Reed* clarified that courts must take the "crucial first step" of determining "whether the law is content neutral *on its face*," which means evaluating whether the law "expressly draws distinctions based on . . . communicative content." *Id.* at 165 (emphasis added). If it does, the law will be subject to strict scrutiny "*regardless* of the government's benign motive, content-neutral justification, or lack of animus towards the ideas contained in the regulated speech." *Id.* (emphasis added & cleaned up). Some facial distinctions will be "obvious" insofar as they define speech "by particular subject matter," whereas others "are more subtle, defining regulated speech by its function or purpose." *Id.* at 163. But "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* A separate category of laws may be facially neutral—but still content based—if they can't be "justified without reference to the content of the regulated speech" or if they were "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Applying this paradigm in *Reed*, the Court found that a town's sign ordinance was content based *on its face* because it exempted from certain permitting requirements three categories of signs—ideological signs, political signs, and temporary-event signs—which were exempted based only on the contents of the messages they expressed. *Id.* at 164–65.

We can see *Reed*'s impact in two opinions—one before *Reed*, the other after—the Seventh Circuit issued in a case called *Norton v. City of Springfield, Illinois*. In its initial decision—issued before *Reed*—the Seventh Circuit recognized that "[t]he [Supreme] Court [had] classified two kinds of

regulations as content based. One [was] regulation that restricts speech because of the ideas it conveys. The other [was] regulation that restricts speech because the government disapproves of its message." *Norton v. City of Springfield, Ill.*, 768 F.3d 713, 717 (7th Cir. 2014), *on reh'g*, 806 F.3d 411 (7th Cir. 2015). Based on that typology, the Seventh Circuit found it "hard to see an anti-panhandling ordinance as entailing either kind of discrimination." *Id.*

But that all changed after *Reed*. As the Seventh Circuit explained in reversing itself on rehearing, *Reed* held that "regulation of speech is content based if a law applies to particular speech because of the topic discussed *or* the idea or message expressed." *Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412 (7th Cir. 2015) (quoting *Reed*, 576 U.S. at 163). In other words, the Seventh Circuit read *Reed* as holding that an ordinance is content based if it distinguishes between *topics* of speech—even if it's neutral with respect to ideas or viewpoints. *Id.* Under this new framework, the Seventh Circuit vacated its prior opinion and reversed and remanded the case for the district court to enjoin an ordinance that prohibited panhandling in a city's historic district. *Id.* In his concurrence, Judge Manion predicted that "[f]ew regulations will survive [*Reed*'s] rigorous standard." *Id.* at 413 (Manion, J., concurring); *cf. Reed*, 576 U.S. at 180 (Kagan, J., concurring) ("Given the Court's analysis, many sign ordinances of that kind are now in jeopardy.").

Judge Manion was right. Since 2015, several courts have found that panhandling ordinances like the City's—especially general bans on panhandling in large swaths of a city, such as commercial zones or historic districts, or near bus stops and sidewalk cafés—are content based and (thus) unconstitutional. *See Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (affirming a preliminary injunction barring enforcement of an anti-loitering law because the law was "a content-based restriction [insofar as] . . . it applie[d] only to those asking for charity or gifts, not those who are, for example, soliciting votes, seeking signatures for a petition, or selling something"—*i.e.*, "its application depend[ed] on the 'communicative content' of the speech"); *Ind. C.L. Union Found., Inc. v. Superintendent,*

*Ind. State Police*, 470 F. Supp. 3d 888, 895, 908 (S.D. Ind. 2020) (preliminarily enjoining an ordinance that banned panhandling (1) at various locations—including bus stops, parking facilities, and within 50 feet of ATMs or entrances to certain buildings; (2) while touching another without consent; and (3) while blocking another's path); *Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 673 (E.D. La. 2017) (permanently enjoining an ordinance that required panhandlers to register with the chief of police and to wear identification before asking for money); *Homeless Helping Homeless, Inc. v. City of Tampa, Fla.*, 2016 WL 4162882, at *6 (M.D. Fla. Aug. 5, 2016) (permanently enjoining a general ban on panhandling in front of sidewalk cafés, within 15 feet of ATMs, and in other designated areas); *Browne v. City of Grand Junction, Colo.*, 136 F. Supp. 3d 1276, 1288–94 (D. Colo. 2015) (permanently enjoining a panhandling ban to the extent it (1) limited the times during which a person could panhandle; (2) prevented solicitation after a first refusal; and (3) banned panhandling on public buses or in parking garages, parking lots, or similar facilities); *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 182 (D. Mass. 2015) (declaring unconstitutional (1) a ban on panhandling in certain areas of the city and (2) a ban on "aggressive panhandling").

As students of constitutional law will recognize, the application of strict scrutiny *usually* sounds the death knell for a challenged ordinance, particularly in the arena of the First Amendment. There are, of course, notable exceptions. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 455 (2015) (holding that a canon of judicial conduct was "narrowly tailored to serve a compelling government interest" and that "the First Amendment pose[d] no obstacle to its enforcement"). But, so far anyway, there don't appear to be exceptions in the panhandling context. Carefully applying strict scrutiny, the courts in the cases we've cited above all came out the same way, concluding that the ordinances failed (or would likely fail) strict scrutiny. And, for that reason, we won't review the strict-scrutiny analysis in each case, other than to make two general observations. The first is that, in some cases, a city may not even be able to articulate the "compelling" interests that animated its decision to enact a panhandling

prohibition. *See, e.g., Homeless Helping Homeless*, 2016 WL 4162882, at *2 (government conceding that it lacked any compelling interest in passing the panhandling law). A city may try to justify its ordinance by invoking a general interest in making its residents and tourists *feel* more "comfortable." But the Supreme Court has explained that a state has no compelling interest in banning uncomfortable (or unpleasant) speech. Indeed, as the Court has pointed out, allowing "uncomfortable message[s]" is a "virtue, not a vice" of the First Amendment. *McCullen*, 573 U.S. at 476; *see also McLaughlin*, 140 F. Supp. 3d at 189 (noting that "the promotion of tourism and business has never been found to be a compelling government interest for the purposes of the First Amendment" and that the First Amendment "does not permit a city to cater to the preference of one group, in this case tourists or downtown shoppers, to avoid the expressive acts of others, in this case panhandlers, simply on the basis that the privileged group does not like what is being expressed"); *Ind. C.L. Union*, 470 F. Supp. 3d at 904 ("[S]imply stating that individuals may not want to be approached for a solicitation is not enough to show a compelling interest.").

Our second observation is that public safety, as a general matter, *is* a compelling government interest. But when a city attempts to justify a panhandling ordinance by reference to public safety, it still has a steep hill to climb—even where, as here, the ordinance targets so-called "aggressive panhandling," which (at the very least) sounds dangerous. That's because "aggressive panhandling" ordinances often sweep in much more speech than is necessary to promote public safety—including speech that is entirely innocuous—while omitting conduct that's genuinely threatening. Where that's true—*viz.*, that the law is both under- and over-inclusive—then it's not narrowly tailored to accomplish the state's compelling interests, however provocatively it's titled. *See, e.g., Blitch*, 260 F. Supp. 3d at 670 ("Panhandling may be annoying to the residents of Slidell, but that does not establish that all panhandling is a threat to public safety. And at best, the City's summary judgment evidence demonstrates that the City is presently having some difficulty identifying aggressive panhandlers and

the ordinance would aid Slidell in enforcing its law. That is an insufficient showing to justify such a sweeping registration requirement on prospective panhandlers."); *Browne*, 136 F. Supp. 3d at 1293–94 ("[T]he problem in this case is that Grand Junction has taken a sledgehammer to a problem that can and should be solved with a scalpel. In attempting to combat what it sees as threatening behavior that endangers public safety, Grand Junction has passed an ordinance that sweeps into its purview non-threatening conduct that is constitutionally protected.").

With that legal framework in mind, we turn to the Plaintiffs' arguments.

## B. The Panhandling Ordinance, § 16-82

### i. *The Panhandling Ordinance is Content Based*

As the above summation should make clear, the Plaintiffs have shown that the Panhandling Ordinance is content based.[10] Like the panhandling laws that, in the wake of *Reed*, have been enjoined by federal courts across the country, our Panhandling Ordinance identifies certain *topics* that a panhandler may not discuss when addressing another person in designated areas. "Panhandling," under the Ordinance, is "[a]ny solicitation made in person *requesting an immediate donation of money or other thing of value*." § 16-82(a) (emphasis added). In that way, the law limits in-person, vocal solicitations for money or things of value. But it *doesn't* touch other topics of discussion. So, for instance, people are free to solicit pedestrians—in person and vocally—for advice, for directions, for their prayers, for a signature on a petition, to read a treatise by John Locke, to join a political party, to visit a restaurant, to come to church, to put on Tefillin, to shake a Lulav, to kiss an Etrog, to join a softball team, etc. As long as the speaker doesn't say something to the effect of "I'm poor, please help" or "Do you have

---

[10] The City essentially (and accidentally) conceded this point at the Hearing by acknowledging that the Panhandling Ordinance is somewhat "more" directed towards the content of speech than the Right-of-Way Ordinance is. *See* Apr. 9, 2021 Hr'g. After *Reed*, though, if an ordinance discriminates based on content *at all*, it's content based.

some spare change?" he may approach a stranger anywhere in the City and utter any *other* message. Because the Panhandling Ordinance prohibits one topic and allows all others, it is content based.

The City nonetheless argues that the law is content neutral because a person can still receive donations by "passively standing or sitting, performing music, or singing with a sign or other indication that a donation is being sought, but without any vocal request other than a response to an inquiry by another person." Response at 7 (quoting § 16-82(a)). Here, the City simply misses the point. The First Amendment doesn't care that the City allows panhandlers to *receive money* by doing *something else*, such as sitting passively with a sign or singing. As *Reed* explained, the First Amendment prohibits government, in the realm of speech, from picking winners and losers—from discriminating against certain classes (or topics) of discussion. And that's precisely what the City has tried to do here.[11]

In this respect, we note that whether the Panhandling Ordinance "leave[s] open ample alternative channels for communication of the information," *McCullen*, 573 U.S. at 477, has to do with

---

[11] We also reject the City's cursory, one-line suggestion that § 16-82 should be subjected to less rigorous scrutiny because it regulates only "commercial speech." Response at 7 n.1. The Supreme Court has said that charitable solicitation is not *purely* economic in nature, even though the speaker requests goods or currency. As the Court explained:

> [S]olicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease. Canvassers in such contexts are necessarily more than solicitors for money. Furthermore, because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech.

*Schaumburg*, 444 U.S. at 632. Drawing from this passage, the lower courts have uniformly held that panhandling is *not* commercial speech. *See Henry v. City of Cincinnati, Ohio*, 2005 WL 1198814, at *6 (S.D. Ohio Apr. 28, 2005) (collecting cases and explaining that, "[a]fter *Schaumburg*, lower federal courts and state courts have equated panhandling to charitable solicitations, [ ] analyzed them under the same framework," and found that "panhandling, like charitable solicitation, is more than mere commercial speech").

whether, in the world of intermediate scrutiny, an ordinance is narrowly tailored. But it doesn't answer the "crucial" threshold question we have here—which is whether the Ordinance, on its face, is content based. The sign ordinance in *Reed* was content based, after all, even though Pastor Reed *could have* used some alternative means to invite people to his church—say, by sending emails or by taking out an ad in the local paper. What mattered, the Supreme Court said, was that Pastor Reed wanted to put a up a sign but couldn't—not because of some general proscription on signs but because of a regulation that discriminated against *the specific topic* he intended his sign to convey. Our Plaintiffs face a similar quandary: They (and, presumably, other panhandlers) may not want to "sing" for money or sit passively and wait for donations; they'd prefer to communicate their message by *speaking* to pedestrians—which is something anyone else can do anywhere in the City, so long as they have a different kind of message to communicate.

The City's content-neutrality cases are wholly inapposite. The City relies, for example, on *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164 (11th Cir. 2018), a post-*Reed* case, which involved an ordinance preventing adult businesses (*i.e.*, ones that "regularly feature[ ] sexual devices") from operating within a certain distance of residential districts, places of worship, parks, or public libraries. *Id.* at 1168. The Eleventh Circuit treated the regulations as content-neutral time, place, and manner restrictions and, accordingly, subjected them to intermediate scrutiny. *See id.* at 1173–74. Out of context, it's true, that holding might seem to support the City's position here. But courts have always handled adult-entertainment ordinances differently—both before and after *Reed. See Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, Ga.*, 703 F. App'x 929, 933 (11th Cir. 2017) ("On their face, the ordinances may appear to be content based because they target adult entertainment; *so if we were applying general principles of First Amendment law, the ordinances would be subjected to strict scrutiny*. Yet under equally well-established Supreme Court and Eleventh Circuit precedent, *adult-entertainment ordinances are not treated like other content based regulations*." (emphases added & internal citation omitted)). There's only

one way to read this passage from *Flanigan's*: outside the special case of adult entertainment, we apply strict scrutiny to regulations that discriminate between *topics* of speech.

As for the City's other cases, they were *all* decided before 2015 and, thus, likely won't survive *Reed*. In *One World One Family Now v. City of Miami Beach*, 175 F.3d 1282 (11th Cir. 1999), for example, the court addressed a regulation that limited nonprofits from setting up portable tables on sidewalks, but which exempted full-service restaurants from the same restrictions. *Id.* at 1284–85. Although it recognized that setting up tables to distribute information was a form of protected speech, the Eleventh Circuit held that the regulation was nonetheless content neutral. *Id.* at 1286–87. When we dig deeper, though, we can see that the Eleventh Circuit deployed a rationale *Reed* later rejected. The court, for instance, noted that the plaintiffs didn't challenge "the city's stated intent" or show that the city meant to "control any particular message." *Id.* at 1287. Certainly, discriminatory *intent*—if established—would be *sufficient* to demonstrate that a law is content based. But, after *Reed*, it isn't *necessary*. As *Reed* made plain, a law may be content based even if, in enacting that law, the government wasn't motivated by some preference (nefarious or otherwise) for a particular message or viewpoint. If, *on the face of the regulation*, there's any differential treatment of communicative content, then the law is content based and subject to strict scrutiny. In *One World*, by contrast, the Eleventh Circuit concluded that, "[a]lthough there is differential treatment between restaurants on the one hand, and other commercial and nonprofit entities in terms of the placement of tables, such a distinction between nonprofit and commercial tables does not turn the ordinance into a content based one." *Id.* That conclusion, we think, no longer stands.

We needn't say more on whether the Ordinance is content based or content neutral, because the very heavy weight of authority supports the Plaintiffs. The ordinances at issue in the post-2015 panhandling cases we've cited bear striking similarities to the Panhandling Ordinance we have here, and our sister courts have unanimously enjoined those laws precisely because they were content based.

So, as the Plaintiffs note, in *Homeless Helping Homeless*, 2016 WL 4162882, at *6, the court permanently enjoined a general ban on panhandling in designated areas, such as in front of sidewalk cafés and within 15 feet of ATMs. Our law's panhandling bans are almost identical. *See* § 16-82(b)(3), (6) (banning panhandling within 15 feet of sidewalk cafés or ATMs). Similarly, in *McLaughlin*, 140 F. Supp. 3d at 182, the court declared unconstitutional a ban on panhandling in certain areas of the city and a general ban on aggressive panhandling. Again, our ban does the same thing. *See* § 16-82(a), (b) (banning panhandling in several types of locations throughout the City and "aggressive panhandling" altogether). And the court in *Browne*, 136 F. Supp. 3d at 1288–94, permanently enjoined an ordinance that (1) prevented solicitation after a first refusal and (2) banned panhandling on public buses or in parking garages, lots, or other parking facilities. Our regulation works a similar prohibition. *See* § 16-82(a), (b)(1), (b)(2), (b)(5) (banning panhandling in similar facilities and locations—and banning "aggressive panhandling" throughout the City). Finally, in *Indiana Civil Liberties Union*, 470 F. Supp. 3d at 895, the court preliminarily enjoined an ordinance that criminalized panhandling (1) at bus stops and parking facilities, (2) on the sidewalk dining area of a restaurant, (3) within 50 feet of entrances to certain commercial buildings or ATMs, and (4) while touching an individual without consent, while blocking the paths of solicited persons, or while behaving in a way that would cause a reasonable person to fear for his safety. If the *Indiana Civil Liberties Union* ordinance sounds familiar, that's because it's almost identical to the Ordinances we have here. *See* § 16-82(a)(3)–(5), (b)(1)–(4), (b)(6)–(7) (banning panhandling in similar facilities and locations and prohibiting all "aggressive panhandling"— defined, in relevant part, as panhandling coupled with unwanted touching, blocking, and behavior that "would reasonably be construed as intended to intimidate, compel or force a solicited person to accede to demands"). The City, by contrast, fails to point us to any post-*Reed* authority upholding similar panhandling bans as content neutral. *See generally* Response.

ii. *The Panhandling Ordinance Will Likely Fail Strict Scrutiny*

Under strict scrutiny, the Panhandling Ordinance is presumptively unconstitutional and survives only if the City can prove that its regulatory scheme "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed*, 576 U.S. at 171. Based on the arguments and evidence presented thus far, the City will likely fail this exacting test.[12]

We start our strict-scrutiny analysis by asking whether the City had a "compelling" justification for passing the Ordinance. At this first step, the City offers two such justifications—only one of which requires much attention here. *First*, it says that "[u]nlimited direct vocal panhandling" posed a "significant problem to the economic interest of the City." Response at 16. But that's not a sufficiently compelling reason to curtail protected speech. *See McLaughlin*, 140 F. Supp. 3d at 189 (explaining that "the promotion of tourism and business has never been found to be a compelling government interest for the purposes of the First Amendment"); *Ind. C.L. Union*, 470 F. Supp. 3d at 904 ("[S]imply stating that individuals may not want to be approached for a solicitation is not enough to show a compelling interest.").

*Second*, the City claims that it enacted the Panhandling Ordinance to protect residents and tourists "from aggressive panhandling . . . which results in unwanted touching, impeding, intimidation and fear of persons who are constantly confronted with vocal requests or demands for monetary donations." Response at 16. But, if the law's purpose is to make people more comfortable—*i.e.*, less "intimidated" or "fearful"—then it fails strict scrutiny because, while advancing the comfort of residents may be a *significant* interest, it isn't a *compelling* one. As we've explained, allowing "uncomfortable message[s]" is a "virtue, not a vice" of the First Amendment. *See McCullen*, 573 U.S.

---

[12] Relying on the faulty premise that § 16-82 is content neutral, the City spends most of its time working within the intermediate-scrutiny paradigm. *See* Response at 7–13. The City does (in fairness) argue, in the alternative, that the law can survive strict scrutiny. *See id.* at 15–16. But its contentions in this regard are perfunctory and unconvincing.

at 476; *see also McLaughlin*, 140 F. Supp. 3d at 189 (explaining that the First Amendment "does not permit a city to cater to the preference of one group, in this case tourists or downtown shoppers, to avoid the expressive acts of others, in this case panhandlers, simply on the basis that the privileged group does not like what is being expressed").

Public safety, on the other hand, *is* a compelling governmental interest. *See McLaughlin*, 140 F. Supp. 3d at 191 ("[T]he Aggressive Panhandling provisions were enacted in furtherance of a compelling state interest: public safety."); *Browne*, 136 F. Supp. 3d at 1292 ("The Court does not question that 'public safety' is a compelling governmental interest."). But it's not clear that the Panhandling Ordinance—which the City now says was designed to prevent "unwanted touching" and "impeding"—was *really* promulgated to promote the public's safety. The City argues that the "restricted areas [listed in the Panhandling Ordinance, § 16-82(b)] present circumstances where the alarm or immediate concern for the safety of individuals by unwanted touching, detaining, impeding or intimidation would be exacerbated (automatic teller machines, parks, sidewalk cafés, public transportation vehicles and parking pay stations) by vocal requests or demands for donations." Response at 9. But it offers no further explanation as to why safety concerns are "exacerbated" in those areas, and it certainly hasn't proffered any *evidence* in support of this public-safety rationale. It hasn't shown (or even suggested), for example, that there's been an uptick in attacks by panhandlers—much less that any such attacks occurred more frequently in the areas the Ordinance singles out for special treatment. Nor has it pointed to police reports or studies demonstrating that panhandlers tend to be more violent in front of sidewalk cafés than in other, uncovered parts of the City. *See Ind. C.L. Union*, 470 F. Supp. 3d at 904 (preliminarily enjoining a panhandling law because the state hadn't "presented any evidence demonstrating that panhandling threatens" public interests—for example, by "showing that panhandling typically escalates to criminal behavior").

Even if it had shown these things, though, the City's public-safety arguments would likely fail on the merits. And that's because, if public safety were *really* the goal, the Panhandling Ordinance would seem to be a very bad way of achieving it. As an example, the law prevents solicitation at bus stops (§ 16-82(b)), where constant crowds might be expected to deter dangerous conduct, but it says nothing about solicitation in back-alleys, where there are fewer people to prevent or deter violent attacks. *See McLaughlin*, 140 F. Supp. 3d at 195 (explaining that panhandling at bus stops, "where people are essentially captive audiences for panhandlers . . . may be more bothersome, and even in some sense more coercive, for a person to be panhandled when they cannot, or find it difficult to leave," but it is "not demonstrably more dangerous"); *Browne*, 136 F. Supp. 3d at 1293 (finding that the city "has not shown—and the Court does not believe—that a solicitation for money or other thing of value is a threat to public safety simply because it takes place in a public parking garage, parking lot, or other parking facility"). The same is true of sidewalk cafés. In these areas, perhaps, panhandling is more *irritating*. But there's no reason to think it any more *dangerous*—and, again, the City shows us no evidence that it is. *See McLaughlin*, 140 F. Supp. 3d at 196 ("No theory or evidence has been offered as to how pedestrians walking near an outdoor café are unusually threatened by panhandlers."). Ultimately, then, the character of the areas the City chose to regulate strongly suggests that the City was motivated, not by any great desire to protect the public from dangerous crimes, but by an understandable (if insufficient) interest in preventing its residents' discomfort.

As for the "aggressive panhandling" aspect of § 16-82, some courts have recognized that comparable laws *can* serve compelling interests. *See id.* at 191 ("[T]he Aggressive Panhandling provisions were enacted in furtherance of a compelling state interest: public safety."). But the City has indisputably banned substantial amounts of protected (and harmless) activities in a way that doesn't seem likely to avert dangerous encounters. For example, § 16-82(a) prohibits a person from "[r]equesting money or something else of value after the person solicited has given a negative response

to the initial request." Since the City has chosen not to defend that restriction specifically, *see generally* Response, it (again) hasn't presented any evidence that such second requests tend to lead to violence. In any case—warning: we're about to operate in an evidentiary vacuum—we see nothing inherently dangerous about a person asking a second question after an initial rejection. A once-rejected panhandler might want to "explain that the change is needed because she is unemployed" or to "state that she will use it to buy food." *McLaughlin*, 140 F. Supp. 3d at 193. Indeed, the panhandler's ability to communicate "the nature of poverty"—which she may decide to do only after a rejection—"sit[s] at the heart of what makes panhandling protected expressive conduct in the first place." *Id.*; *see also Browne*, 136 F. Supp. 3d at 1293 (finding the city's anecdotal evidence of second-request solicitations unpersuasive because "in neither instance [did] it appear that the safety of the person being solicited was threatened simply because the person doing the soliciting had made a second request after the initial request was refused," and noting that the court did "not believe . . . that a repeated request for money or other thing of value necessarily threatens public safety").

The "aggressive panhandling" provision of the Panhandling Ordinance *does* prohibit other behavior that *could* lead to precarious encounters, such as intimidating or "[t]ouching a solicited person without explicit permission." § 16-82(a). But the State has already criminalized assault and battery, *see* FLA. STAT. §§ 784.011 *et seq.*, and the City doesn't explain why a batterer should receive *enhanced* penalties solely because, before the assault, he asked the victim for change. And, if the answer to that question isn't at first glance obvious, think for a moment about how underinclusive the provision is: Those enhancements, after all, would apply to the batterer who first asked for pennies but *not* to the activist who, before the assault, asked the victim to join the Communist Party or the Ku Klux Klan. In the end, "[t]he City may not deem criminal activity worse because it is conducted in combination

with protected speech, and it certainly may not do so in order to send a message of public disapproval of that speech on content based grounds." *McLaughlin*, 140 F. Supp. 3d at 193.[13]

Nor is the City likely to show that the law is narrowly tailored to serve a compelling state interest. As we've hinted, when it comes to promoting public safety—the only compelling interest the City has identified—the law is both over- *and* under-inclusive. We've already seen how under-inclusive it is—and it isn't hard to conjure a hundred other examples of its under-inclusivity. But, by sweeping in the speech activities of countless panhandlers who will never act violently towards another, the law is also woefully—and unconstitutionally—over-inclusive. *See, e.g.*, *Browne*, 136 F. Supp. 3d at 1292–94 (striking down panhandling bans that were "over-inclusive" because "they prohibit[ed] protected speech that pose[d] no threat to public safety"). Here, again, the City hasn't told us what percentage of its targeted panhandlers is likely to turn violent—so we can safely assume that the percentage is unacceptably small. The City, in short, has failed to demonstrate that the law constitutes the least restrictive means of promoting public safety. It will, of course, have the chance to make its case later

---

[13]     In *McLaughlin*, the court distilled ten different "aggressive panhandling" prohibitions into three categories—two of which are relevant here. The first category encompassed provisions that duplicated existing sanctions but were "directed specifically at panhandling." 140 F. Supp. 3d at 182. One subsection, for instance, criminalized panhandling "intended or likely to cause a reasonable person to fear bodily harm to oneself"—which was really just an assault under Massachusetts law. *Id.* The second relevant category included those provisions that prohibited non-criminal, but "coercive," behavior. *Id.* at 183. "Coercive" behavior included, for example, continuing to solicit a person after that person has "given a negative response to such soliciting." *Id.*
          The court concluded that neither of these two categories of prohibitions could survive strict scrutiny. Starting with the so-called "duplicate" provisions, the court found that "[t]he City ha[d] not demonstrated that public safety requires harsher punishments for panhandlers than others who commit assault or battery or other crimes." *Id.* at 193. Here, the court relied on the Supreme Court's decision in *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992), for the proposition that a state may not treat criminal activity more harshly simply because it's conducted in combination with protected speech. As for the second category, the court found that "bans on following a person and panhandling after a person has given a negative response are not the least restrictive means available." *McLaughlin*, 140 F. Supp. 3d at 194.

on. For now, though, we find that the Plaintiffs are likely to prevail in their First Amendment challenge to the Panhandling Ordinance.

### C. The Right-of-Way Ordinance, § 25-267

The Right-of-Way Ordinance presents more challenging questions, some of which were first raised at the Hearing. The Court therefore invited supplemental briefing on whether the "hand-to-hand exchange" prohibition in § 25-267(a) is content based and on the scope of § 25-267(d), which incorporates the City's general sign ordinance. We address these issues in turn.

#### i. *Selling and Advertising or Requesting Donations*

The Right-of-Way Ordinance prevents people, while standing on "any portion" of a designated arterial road, from (1) selling anything or offering a service of any kind, or advertising things or services of any kind; (2) seeking donations of any kind; or (3) engaging in any hand-to-hand exchange with a driver, even one who is temporarily stopped. § 25-267(a), (b). The first two prohibitions are clearly content based. The third we'll address in a separate section below.

The City takes a different approach than we do. Rather than address each of the three prohibitions in isolation, it treats the entire provision as one "all[-]encompassing" ban on "all manner of interactions between pedestrian solicitors and the drivers and occupants of motor vehicles engaged in traffic." Supplemental Response at 5. According to the City, it is "[i]mplicit in § 25-267 . . . that the pedestrian solicitor is attempting to sell something to the occupant of a motor vehicle, obtain a donation from the occupant of a motor vehicle and/or exchange anything else (leaflet, advertising, etc.) by hand with the driver or occupant of a motor vehicle engaged in traffic." *Id.* The provision (the City would have us believe) is thus nothing more than a ban on walk-up interactions with drivers on designated roads—and, in that way, *doesn't* discriminate based on content. We disagree.

Let's "start with the text." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019). The provision reads, in pertinent part, as follows:

> *Right-of-way canvasser or solicitor* shall mean any person who sells or offers for sale anything or service of any kind, or advertises for sale anything or service of any kind, or who seeks any donation of any kind, or who personally hands to or seeks to transmit by hand or receive by hand anything or service of any kind, whether or not payment in exchange is required or requested, to any person who operates or occupies a motor vehicle of any kind, which vehicle is engaged in travel on or within any portion of any of the streets or roadways in the city, whether or not such vehicle is temporarily stopped in the travel lanes of the road.

§ 25-267(a). Read plainly, the provision doesn't apply *only* to interactions with motorists, as the City suggests. Instead, it prohibits three different kinds of activities a panhandler might engage in while standing on any portion of a public right-of-way—*regardless* of whether one approaches a motorist. We know this because the prepositional phrase at the end of the provision—"to any person who operates or occupies a motor vehicle of any kind"—modifies *only* the third activity (hand-to-hand transmissions) but not the first two. A person thus unmistakably violates § 25-267(a)–(b) by standing in the crosswalk of an arterial road and asking a *pedestrian* for a donation. The Ordinance, in other words, can be broken out as follows *without* changing any of its meaning:

> *Right-of-way canvasser or solicitor* shall mean any person
>
> > **[1]** who sells or offers for sale anything or service of any kind, or advertises for sale anything or service of any kind, *or*
> >
> > **[2]** who seeks any donation of any kind, *or*
> >
> > **[3]** who personally hands to or seeks to transmit by hand or receive by hand anything or service of any kind, whether or not payment in exchange is required or requested, to any person who operates or occupies a motor vehicle of any kind, which vehicle is engaged in travel on or within any portion of any of the streets or roadways in the city, whether or not such vehicle is temporarily stopped in the travel lanes of the road.

§ 25-267(a) (emphases and numbers added). Those three activities are then banned on "any portion of [certain] public right[s]-of-way." § 25-267(b).

Our conclusion—that the prepositional phrase at the end of the third provision modifies only hand-to-hand exchanges with motorists—flows naturally from five mutually-reinforcing principles of textual interpretation. *First*, a "[a] timeworn textual canon" provides that, when a statute "include[s] a

list of terms or phrases followed by a limiting clause," the limiting clause "should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (cleaned up); *see also* BLACK'S LAW DICTIONARY 1532–33 (10th ed. 2014) ("[Q]ualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing."); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 144 (2012) (noting that, under the "last antecedent" rule, limiting phrases should be read as modifying only the words and phrases that immediately precede them). *Second*, each of the three activities the Right-of-Way Ordinance proscribes is introduced with the relative pronoun "who" and is separated from the others by the disjunctive "or"—thereby cordoning off each clause and isolating the third activity with its *own* prepositional phrase. *Cf.* SCALIA & GARNER at 148 (explaining that the "typical way in which syntax would suggest no carryover modification is that a determiner (*a*, *the*, *some*, etc.) will be repeated before the second element"). *Third*, the prepositional phrase doesn't match up grammatically with the second activity—requesting donations. Recall the phrasing: "*Right-of-way canvasser or solicitor* shall mean any person . . . who seeks any donation of any kind . . . *to* any person who operates or occupies a motor vehicle of any kind." § 25-267(a) (emphasis added). A person seeks donations *from* others, not *to* them. The only natural explanation for this grammatical incongruity is that, contra the City's position, the prepositional phrase *isn't* meant to modify the second clause. *Fourth*, the label "right-of-way canvasser" suggests that the Commission intended to define this type of panhandler by reference to his *location* (*i.e.*, on the right-of-way), rather than by his *conduct* (*viz.*, whether he interacts with motorists). *Fifth*, if the City Commission had, in fact, intended to enact a universal ban on driver-motorist interactions, it could have done that—with far fewer (and simpler) words.

When read properly, then, the statute clearly prohibits two speech activities—our first two "subsections" above—based on their communicative content. A person may not stand on any portion

of one of the designated rights-of-way and (1) sell (or advertise for sale) a service or item, or (2) ask for a donation. Nothing on the face of the Right-of-Way Ordinance, though, prevents a person from standing in precisely the same spot and communicating *other* messages, such as "Vote for Jones," "Join the Nazis," or "Read John Locke." In that way, those first two clauses are content based and subject to strict scrutiny.

And, for many of the same reasons we've already given, those clauses are unlikely to survive strict scrutiny. The clauses prohibit someone from standing on "any portion" of a designated right-of-way, such as a median or crosswalk, and "requesting a donation." But why would it be more dangerous to stand on that crosswalk and ask for a donation than, say, to stand in that same place and talk to pedestrians about politics, religion, books, ideas, sports, or *anything else*? Again, we needn't speculate on what the answer to this question might be because the City (notably) doesn't offer one— which is reason enough to find that the law isn't narrowly tailored to the City's goal of promoting traffic safety.

Even accepting the City's argument that it *meant* the two clauses to act *only* as a ban on pedestrian-driver interactions (on designated roads), *see* Supplemental Response at 6, the clauses would still be content based *on its face* as to the first two activities. That's because a person walking up to the car *cannot* sell or advertise goods or services and *cannot* request a donation, but he *can* walk up to a car for a chat about John Locke, Jack Nicklaus, or Joe Biden. *Cf. Fernandez v. St. Louis Cnty., Mo.*, 461 F. Supp. 3d 894, 898 (E.D. Mo. 2020) (finding that a law banning people from "stand[ing] in a roadway for the purpose of soliciting a ride, employment, charitable contribution or business from the occupant of any vehicle" was content based). Why are the latter three topics of conversation *less* dangerous than the former? The City doesn't say. As a result, even if we bought the City's position about what it *intended* the two clauses to do—for which we haven't a shred of evidence—the clauses still wouldn't survive strict scrutiny.

ii. *Hand-to-Hand Transmission*

On the Ordinance's third clause, the parties find some common ground: They agree that this hand-to-hand transmission clause (the one we've isolated as the third activity) is content neutral and subject to *intermediate* scrutiny. *See* Supplemental Brief at 1; Supplemental Response at 1. Although that agreement alleviates the City's burden *somewhat*, the City must still show *both* that the provision is "narrowly tailored to achieve a significant government interest" *and* that it "leaves open ample alternative channels of communication." *Bloedorn*, 631 F.3d at 1231 (cleaned up). In *McCullen v. Coakley*, the Supreme Court added that, to survive intermediate scrutiny, the government must demonstrate that it "seriously undertook to address the problem with less intrusive tools readily available to it" and "considered different methods that other jurisdictions have found effective." 573 U.S. at 494. The City fails to meet this less rigorous standard here.

Rather than describe protracted investigation, factfinding, and legislative debate, the City says simply that it "operat[ed] under the premise" that it could promote traffic safety by extending the Right-of-Way Ordinance to arterial roads, which are "heavily travelled and operating beyond their capacity." Supplemental Response at 2. Based on that premise, the City explains, it concluded that "prohibiting solicitors from interacting with motorists engaged in travel, either from a median, sidewalk or the roadway itself, furthers the City's interest in trying to maintain or improve traffic flow on these overcapacity and heavily travelled roadway segments." *Id.* at 3. Although these aren't entirely unreasonable assumptions, they're just that—*assumptions*. At trial, the City will bear the *evidentiary* burden of proving that the provision is narrowly tailored in a way that satisfies intermediate scrutiny; for now, though, it must show (at the very least) that it will be able to carry its burden down the road. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) ("As the Government bears the burden of proof on the ultimate question of [a statute's] constitutionality, respondents must be deemed likely to prevail [on the merits] unless *the Government has shown* that respondents' proposed less restrictive alternatives

are less effective than [the challenged statute].” (emphasis added)); *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (explaining that, when considering the likelihood-of-success element of a request for a preliminary injunction, “the district court should have inquired whether there is a sufficient likelihood the State will ultimately fail to prove its regulation constitutional,” and having “little difficulty in concluding that appellants are likely to succeed on their claim *because the State has not shown* its ability to justify the statutes’ constitutionality” (emphasis added)).[14] In other words, the City must point to some evidence (*e.g.*, traffic reports, baseline studies, citizen complaints, etc.) that its Ordinance was justified by some significant government interest.

That’s important here for at least two reasons. *First*, the City’s “premises” aren’t unassailable, even if they aren’t facially unreasonable. For example, it may be, as the Plaintiffs suggest, that “[a] person lawfully standing on the sidewalk who accepts a donation from a motorist who is stopped at a light in the lane next to the sidewalk poses no greater danger than a person standing on the sidewalk who is holding a sign.” Supplemental Reply at 2. Or it may be that there’s never been a single accident in the City involving (or caused by) a hand-to-hand exchange between a panhandler and a temporarily stopped motorist. Or it may be that accidents have happened only when the panhandler walks out into the middle of the street, whereas hand-to-hand exchanges from the *sidewalk* have proven to be relatively safe. In any of these three (quite reasonable) scenarios, the City would have had less intrusive ways of promoting traffic safety. And, as should be obvious, under any of these three hypotheticals,

---

[14] *See also S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1147 (9th Cir. 1998) (remanding for entry of a preliminary injunction where “there is no evidence that an outright ban on commercial canvassing is necessary to meet the asserted interests of the County”); *Chase v. Town of Ocean City*, 825 F. Supp. 2d 599, 617 (D. Md. 2011) (concluding, at the preliminary injunction stage of a First Amendment case, that the city carried its burden of persuasion under intermediate scrutiny); *cf. Ezell v. City of Chicago*, 651 F.3d 684, 708–09 (7th Cir. 2011) (where a city had the trial burden to justify a firearm regulation, it didn’t—at the preliminary injunction stage—“come close to satisfying this standard” because “the City presented no data or expert opinion to support” the regulation and its public safety concerns were “entirely speculative”).

our law would be both over- and under-inclusive: over-inclusive because it penalizes panhandlers whose conduct is not dangerous; under-inclusive because it punishes only the panhandler and not the driver.

*Second*, and more problematic, is the lack of *any* evidence to justify the law. As we've suggested, that evidentiary lacuna seems to confirm the Plaintiffs' view that the City operated off of assumptions and didn't (as the Supreme Court requires) "seriously [endeavor] to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 494. Again, the City has said nothing about whether it investigated the issue, what evidence it collected, or the extent to which it entertained other regulatory options. The City can't so completely curtail a citizen's First Amendment rights based only on what amounts to speculation.

For those two reasons, *Cosac Foundation v. City of Pembroke Pines*, 2013 WL 5345817 (S.D. Fla. Sept. 21, 2013), doesn't help the City here. There, Judge Rosenbaum—then on the district court— concluded that a similar ordinance survived intermediate scrutiny precisely because the city *had* submitted evidence of narrow tailoring. *See id.* at *18 (explaining that the city tailored its law based on "information from a variety of sources," including police reports "mapping traffic accidents at City intersections," Florida Department of Safety and Motor Vehicles data on "crashes involving pedestrians in the state," and news reports "on fatal and non-fatal accidents involving right-of-way canvassers nationwide, which revealed three such accidents that occurred in South Florida and involved roadway newspaper vendors"). As we've said, our City passed the Right-of-Way Ordinance without doing (or collecting) any of this.

In passing, it's true, Judge Rosenbaum added that, "even if the City had not introduced such detailed evidence into the record, 'common sense and logic' would still support the City's determination that canvassing and soliciting drivers on heavily trafficked streets presents substantial traffic flow and safety hazards both to pedestrians and motorists." *Id.* We agree in principle that there's

*some* logical fit between the banning of hand-to-hand transmissions on busy streets and traffic safety.[15] But that doesn't answer the questions presented here: whether solicitation by sidewalk panhandlers is comparatively safe or whether, as we've said, our regulation is under-inclusive insofar as it penalizes solicitors but not motorists. Those questions may not have been raised in *Cosac*. In any event, in the years since *Cosac*, the Supreme Court has held that a governmental entity bears the evidentiary burden of demonstrating that it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 494. That evidentiary requirement, it goes without saying, supersedes Judge Rosenbaum's *obiter dictum*, such as it is, that an ordinance can survive intermediate scrutiny on "common sense and logic" alone. And the City here has only common sense to go on. It explicitly admits, in fact, that it operated only under certain "premises" (read: assumptions); and it points to *no* evidence that it investigated, studied, or even solicited reports on the issue—any one of which might have shown that it seriously undertook to address the problem by less intrusive means.

The Plaintiffs, in short, are likely to succeed on the merits of this claim.

      iii.   *The Sign Ordinance, § 25-267(d)*

The City continues to maintain, as it did at the Hearing, that § 25-267(d) "deals almost exclusively with signage on private property that *can be viewed from* the public right of ways" and that it is "difficult to conjure a scenario in which the provision would have any application to the Plaintiffs or other pedestrian solicitors who may be carrying a sign to facilitate their activities." Supplemental Response at 6 (emphasis added). To the extent that City officers were, in practice, relying on this provision to arrest canvassers who were standing on *public* rights-of-way, the City represented that, in consultation with the Plaintiffs, it would draft a memorandum, telling its officers to desist from any such future arrests. *See* April 9, 2021 Hr'g. The City later promised to file a notice by April 30, 2021,

---

[15] Given the trajectory of Judge Rosenbaum's career since her decision in *Cosac*, we couldn't really say otherwise.

indicating whether it had issued that enforcement moratorium. *See* Response at 6. As of this writing, however, the City has filed no such notice—and there's no indication in the record that it has ordered its officers to stop enforcing this provision on public rights-of-way. *See generally* Docket. We therefore address the provision and, as with the others, enjoin its enforcement.

We begin, as we must, with the text of § 25-267(d). Contra the City's arguments, that provision unambiguously applies to canvassers who hold signs on *public* rights-of-way. The provision reads as follows:

> It is a violation of this section for any *right-of-way* canvasser or solicitor to hold, carry, possess or use any sign or other device of any kind, *within any portion of the public right-of-way* contrary to any of the terms and provisions of section 47-22, of the Unified Land Development Regulations.

§ 25-267(d) (emphases added). As the text makes pellucid, the City Commission simply incorporated the "terms and provisions" of its general sign ordinance—things like dimensional requirements and display characteristics—into a *different* ordinance, which regulates solicitors and canvassers on *public* rights-of-way. And that make sense: Why reinvent the legislative wheel when you can simply borrow from another law? The City's reading, by contrast, makes no sense—as the City itself acknowledged at the Hearing, when it conceded that, given its construction, the subsection had no "viable application." Apr. 9, 2019 Hr'g. The truth is that the City doesn't need panhandling proscriptions to prevent panhandlers from entering private property for two obvious reasons: *one*, it already has trespassing laws that do that; and *two*, panhandlers don't generally canvas on private property because there are orders of magnitude more people to solicit—motorists and pedestrians—on *public* property.

To the extent the City's arguing that it needed to regulate *signage* on private property, we know that isn't true either, because the sign ordinance, by its terms, already regulates the size and structure of signs on private property. *See* § 47-22-1(c) ("This section regulates the time, place and manner in which a sign is erected, posted, *or displayed* on private property[.]" (emphasis added)). The City's reading would thus render § 25-267(d) entirely superfluous—a cardinal sin of statutory interpretation. *See*

*Corley v. United States*, 556 U.S. 303, 314 (2009) (recognizing that "one of the most basic interpretive canons" is that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant"); SCALIA & GARNER at 174 ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."). We note, too, that, if the City Commission didn't actually intend for this law to apply on public property, then the City's police officers—who are trained to carry out the City Commission's will—didn't get the memo. They, after all, have consistently used this provision to cite and arrest canvassers on *public* rights-of-way. *See, e.g.*, Arrest Report at 32 (police report stating that canvasser had been cited under Right-of-Way Ordinance because the officer saw him "hold, carry, possess and use a sign *within a portion of the public right of way*" (emphasis added)).

It is, of course, possible that § 25-267(d) incorporates only content-neutral time, place, and manner sign restrictions, such that it *could* withstand intermediate scrutiny. Oddly, however, the City has chosen *not* to defend the Sign Ordinance on those grounds: it never argues that the Ordinance is content-neutral, offers no legitimate governmental interest, and adduces no evidence that the Ordinance is in any way tailored to that interest. *See generally* Response; Supplemental Response. It's thus waived any such arguments. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). The City concedes—albeit for different reasons—that the Ordinance *shouldn't* be enforced on public rights-of-way. *See* Apr. 9, 2019 Hr'g. Nevertheless, as we've said, its police officers have been enforcing the law as if it did apply there. Because the City hasn't directed its officers to stop

enforcing the law—and given that it hasn't justified the law on any other ground—the Plaintiffs are entitled to a preliminary injunction.[16]

## II.    THE REMAINING ELEMENTS

The Plaintiffs easily satisfy the remaining elements of a preliminary injunction. *First*, it's well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). In *KH Outdoor*, the city cited a local sign ordinance in denying the plaintiff's application for outdoor advertisements and billboards. *See id.* at 1264. Although the district court didn't make any findings about irreparable injury, the Eleventh Circuit explained that the sign ordinance's direct penalization—rather than "incidental inhibition"—of protected speech, standing alone, established irreparable injury. *Id.* at 1272. It thus concluded that the district court "did not abuse its discretion on those grounds, because the injury (categorically barring speech by prohibiting noncommercial billboards) was of a nature that could not be cured by the award of monetary damages." *Id.*

Our Plaintiffs' free-speech rights have been similarly abridged, and their claim to irreparable injury is no less straightforward. Money damages, after all, won't compensate them for the past deprivation of their constitutional rights. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (noting that "chilled free speech . . . [cannot] be compensated for by monetary damages"). Indeed, our Plaintiffs may feel this "chilling" effect more acutely than most because they've staked their livelihoods to the outcome of this case. Our Plaintiffs, recall, don't panhandle for fun; they canvass the streets because it's their only means of subsistence.

---

[16] Because the provision applies to panhandlers who hold signs on *public* property—and given that our Plaintiffs do precisely that, *see* Complaint ¶¶ 37, 43 (alleging that the Plaintiffs hold signs while panhandling on sidewalks)—the Plaintiffs have standing to challenge the provision facially.

Were we to push off our injunction until the end of the case, therefore, we'd be preventing them (perhaps for six months or more) from collecting the donations they need to survive. That, we think, is precisely what the law means when it speaks of irreparable injury.

The City counters that "there is no assertion that the challenged regulations have even been applied to [the Plaintiffs], through an arrest or citation." Response at 13. But that's really just a rehash of its standing objection, which we've rejected already—and which, in any event, is foreclosed by the many decisions granting, in similar circumstances, pre-enforcement preliminary injunctions. *See, e.g.*, *KH Outdoor*, 458 F.3d at 1271–72; *Ashcroft*, 542 U.S. at 663; *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020).

We find even less persuasive the related argument that the Plaintiffs cannot establish irreparable injury because they continue to panhandle—despite the Ordinances. *See* Response at 13. As we've said, whether a plaintiff continues to engage in prohibited speech is immaterial where he has alleged—as the Plaintiffs have here, *see* Complaint ¶¶ 39, 45—that, were it not for the offending ordinance, he would have engaged in more of the conduct the ordinance proscribes. That reticence to exercise one's free-speech rights lies at the very heart of our irreparable-injury jurisprudence. *Cf. Towbin v. Antonacci*, 885 F. Supp. 2d 1274, 1295 (S.D. Fla. 2012) ("[T]he Court rejects the notion that Plaintiff is not entitled to an injunction either because her injury (a slight intrusion into her speech and associational rights) or its duration . . . are minimal.").

*Second*, the harm from the threatened injury outweighs any harm to the public interest. *See Gonzalez*, 978 F.3d at 1270–71. A temporary infringement of First Amendment rights "constitutes a serious and substantial injury," whereas "the public, when the state is a party asserting harm, has *no interest* in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (emphasis added). Enforcing unconstitutional laws not only wastes valuable public resources; it "disserves" the public interest. *Id.* at 1290, 1297; *see also Otto*, 981 F.3d at 870 ("The nonmovant is the

government, so the third and fourth requirements—'damage to the opposing party' and 'public interest'—can be consolidated. It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance."); *KH Outdoor*, 458 F.3d at 1272–73 ("As for the third requirement for injunctive relief, the threatened injury to the plaintiff clearly outweighs whatever damage the injunction may cause the city . . . [because] the city has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance.").

The City correctly notes that the "less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Response at 14 (quoting *Scott*, 612 F.3d at 1297). And, the City says, we shouldn't be "certain" here because the Plaintiffs haven't cited Eleventh Circuit or Supreme Court cases overturning similar panhandling ordinances under *Reed*. But *Reed*'s teachings are clear, and we have no trouble applying it to the facts of this case. The Plaintiffs, moreover, have cited several cases from *other* circuits—*q.v.*, Part I.A.—applying *Reed* and enjoining similar ordinances. The City, by contrast, has cited not a single post-*Reed* case (within or outside this Circuit) that directly supports its position. Instead, as we've seen, it continues to rely on *Stardust* and its progeny, which dealt with a distinct area of free-speech jurisprudence: the "secondary effects" of adult businesses. It relies on these cases despite the Eleventh Circuit's unambiguous, post-*Reed* admonition that "adult-entertainment ordinances are *not* treated like other content based regulations." *Flanigan's*, 703 F. App'x at 933 (emphasis added). The Plaintiffs, in short, plainly have the better side of this argument.

\*\*\*

For all these reasons, the Plaintiffs' Motion [ECF No. 5] is **GRANTED**. The City is **PRELIMINARILY ENJOINED** from enforcing §§ 16-82 and 25-267 of the City Code.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 23rd day of June 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

**Appendix A**

**Sec. 16-82. - Panhandling, begging or solicitation.**

(a) Definitions. The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section.

*Aggressive panhandling, begging or solicitation* means:

    (1) Approaching or speaking to a person in such a manner as would cause a reasonable person to believe that the person is being threatened with either imminent bodily injury or the commission of a criminal act upon the person or another person, or upon property in the person's immediate possession;

    (2) Requesting money or something else of value after the person solicited has given a negative response to the initial request;

    (3) Blocking, either individually or as part of a group of persons, the passage of a solicited person;

    (4) Touching a solicited person without explicit permission; or

    (5) Engaging in conduct that would reasonably be construed as intended to intimidate, compel or force a solicited person to accede to demands.

*Panhandling* means:

    (1) Any solicitation made in person requesting an immediate donation of money or other thing of value for oneself or another person or entity; and

    (2) Seeking donations where the person solicited receives an item of little or no monetary value in exchange for a donation, under circumstances where a reasonable person would understand that the transaction is in substance a donation.

Panhandling does not mean the act of passively standing or sitting, performing music, or singing with a sign or other indication that a donation is being sought, but without any vocal request other than a response to an inquiry by another person.

(b) Prohibited areas of panhandling, begging or solicitation. It shall be unlawful to engage in the act or acts of panhandling, begging or solicitation when either the solicitation or the person being solicited is located in, on, or at any of the following locations:

    (1) Bus stop or any public transportation facility;

    (2) Public transportation vehicle;

    (3) Area within fifteen (15) feet, in any direction, of a sidewalk café[;]

    (4) Parking lot, parking garage, or parking pay station owned or operated by the city;

    (5) Park owned or operated by the city;

    (6) Area within fifteen (15) feet, in any direction, of an automatic teller machine;

    (7) Area within fifteen (15) feet, in any direction, of the entrance or exit of a commercial or governmental building; or

(8) Private property, unless the person panhandling has permission from the owner of such property.

(c) It shall be unlawful to engage in the act of aggressive panhandling in any location in the city.

(d) Penalty. Any person found guilty of violating this section shall, upon conviction, be penalized as provided in section 1-6 of this Code.

# Appendix B

## Sec. 25-267. - Right-of-way solicitors and canvassers.

(a) *Definition.* The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Right-of-way canvasser or solicitor* shall mean any person who sells or offers for sale anything or service of any kind, or advertises for sale anything or service of any kind, or who seeks any donation of any kind, or who personally hands to or seeks to transmit by hand or receive by hand anything or service of any kind, whether or not payment in exchange is required or requested, to any person who operates or occupies a motor vehicle of any kind, which vehicle is engaged in travel on or within any portion of any of the streets or roadways in the city, whether or not such vehicle is temporarily stopped in the travel lanes of the road.

*Right-of-way* shall have the same definition as provided in section 25-97 of the Code of Ordinances.

(b) *Prohibition of right-of-way canvassers and solicitors.* It shall be unlawful for any person to act as a right-of-way canvasser or solicitor on any portion of a public right-of-way with a functional classification of arterial on the Broward County Highway Functional Classifications Map and a Broward County Metropolitan Planning Organization Roadway 2012 Peak Level of Service (LOS) designation of D, E or F. (See Exhibit "A" following § 25-267)

(c) *Prohibition of storage of goods, merchandise and other materials.* It shall be unlawful for any person to store or exhibit any goods, merchandise or other materials on any portion of the public street, including the median, or bicycle lane.

(d) It is a violation of this section for any right-of-way canvasser or solicitor to hold, carry, possess or use any sign or other device of any kind, within any portion of the public right-of-way contrary to any of the terms and provisions of section 47-22, of the Unified Land Development Regulations.

(e) Nothing in this section shall be construed to apply to:

(1) Licensees, lessees, franchisees, permittees, employees or contractors of the city, county or state authorized to engage in inspection, construction, repair or maintenance or in making traffic or engineering surveys.

(2) Any of the following persons while engaged in the performance of their respective occupations: firefighting and rescue personnel, law enforcement personnel, emergency medical services personnel, health care workers or providers, military personnel, civil preparedness personnel, emergency management personnel, solid waste or recycling personnel; public works personnel or public utilities personnel.

(3) Use of public streets, alleys, sidewalks or other portions of the public right-of-way in areas which have been closed to vehicular traffic for festivals or other events or activities permitted by the city.

(f) Violations of this section shall be punishable as provided in section 1-6 of this Code.



**LEGEND**

Peak Level of Service 2012

| | | |
|---|---|---|
| ─── No Data | ─── D | ⊏⊐ Fort Lauderdale Boundary |
| ─── C | ─── E | 🏫 School |
| | ─── F | Park Locations |
| | | Streets |

0    0.5    1                    2
Miles
GRAPHIC SCALE

N

* Level of Service (LOS) is a traffic quality measure based on roadway performance, rated A-F. All major corridors within
the City of Fort Lauderdale, as reported by the Metropolitan Planning Organization, had LOS C or worse.

**City of Fort Lauderdale**
**Peak Level of Service 2012**

Exhibit "A" of Ordinance C-14-38

7/1/2014

CITY OF FORT LAUDERDALE