UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-60168-ALTMAN/Hunt

**MARK MESSINA**, *et al.*,

       *Plaintiffs,*

*v.*

**CITY OF FORT LAUDERDALE, FLORIDA**
*a Florida municipal corporation,*

       *Defendant.*

_____/

## <u>ORDER</u>

Our Plaintiffs, Mark Messina and Bernard McDonald (men of limited means), lived in the City of Fort Lauderdale (our Defendant). To support themselves, the Plaintiffs held up signs and solicited donations along the City's main roads. But the City, citing its interests in traffic safety and efficiency, passed a pair of ordinances designed to stop them from panhandling—what we've called the Panhandling Ordinance and the Right-of-Way Ordinance. This lawsuit challenges the constitutionality of both.

At summary judgment, the City abandoned its defense of the Panhandling Ordinance and nearly everything in the Right-of-Way Ordinance, except for a single clause: the Hand-to-Hand Transmission Clause. On that clause, the City did *just* enough to survive summary judgment, so we proceeded to trial. But, because the City introduced very little pre-enactment evidence showing that it narrowly tailored the Hand-to-Hand Transmission Clause to advance its stated interest, we now enter **FINAL JUDGMENT** for the Plaintiffs. After careful consideration, therefore, we **DECLARE** the Hand-to-Hand Transmission Clause unconstitutional and permanently **ENJOIN** the City from enforcing it.

At the same time, as we'll see, the Plaintiffs introduced precious little credible evidence to support their damages claims. We therefore award them only nominal damages. Before we get into all that, though, we'll need to address something that happened before trial.

## ONE PRELIMINARY MATTER

On June 3, 2022, in the Plaintiffs' Unopposed Motion to Continue the Pretrial Filing Deadlines and Reset Trial Date [ECF No. 89], the parties brought to our attention the sudden and unfortunate passing of Mark Messina. So, on June 9, 2022, we called the lawyers in for a status conference and asked them how Messina's death might affect our case. *See generally* Paperless Minutes for Proceedings Held on June 9th, 2022 [ECF No. 93]. At that hearing, we agreed on several things. *First*, the lawyers said that Messina's death should have no effect on the Plaintiffs' then-pending Motion for Partial Summary Judgment [ECF No. 68]—and we agreed, *see generally* Order on the Plaintiffs' Motion for Partial Summary Judgment ("MSJ Order") [ECF No. 97]. *Second*, the Plaintiffs' lawyer promised to substitute Messina's estate into the case under Rule 25, which allows for substitution "within 90 days after service of a statement noting the death [of a party]," so long as "the claim is not extinguished." FED. R. CIV. P. 25(a)(1). The City didn't oppose this substitution. And, on September 30, 2022, we allowed Messina's sister, Laurel Messina Rawls, to substitute into the case as personal representative of the Estate of Mark Messina. *See generally* Paperless Order Granting the Plaintiffs' Unopposed Motion to Substitute Proper Party [ECF No. 106].

Of course, none of this affected McDonald's case. *See* FED. R. CIV. P. 25(a)(2) ("After a party's death, if the right sought to be enforced survives only to or against the remaining parties, *the action does not abate*, but proceeds in favor of or against the remaining parties." (emphasis added)); *see also Chad v. City of Fort Lauderdale*, 66 F. Supp. 3d 1242, 1244 n.2 (N.D. Fla. 1998) (relying on FED. R. CIV. P. 25(a)(2)—after the named plaintiff had died—to adjudicate dispositive motions filed by a class of "homeless persons in Broward County" who were challenging the constitutionality of a panhandling

ordinance). And, while the personal representative of Messina's estate didn't show up at trial, we admitted Messina's deposition under FED. R. CIV. P. 32(a)(4)(A), which authorizes "[a] party [to] use for any purpose the deposition of a witness, whether or not a party, if the court finds: (A) that the witness is dead[.]"[1]

One last thing on Messina's death. Both Plaintiffs seek declaratory, injunctive, and monetary relief in each of their § 1983 claims: Count I, which challenges the Panhandling Ordinance, and Count II, which attacks the Right-of-Way Ordinance. *See generally* Verified Complaint for Declaratory and Injunctive Relief and Damages ("Complaint") [ECF No. 1]. But the lawyers agreed, at the June 9th hearing, that Messina's estate (if substituted) wouldn't satisfy the elements of a permanent injunction. *Cf. Out-Grow, LLC v. Miami Mushroom*, 2021 WL 2823266, at *9 (S.D. Fla. July 7, 2021) (Altman, J.) ("A plaintiff seeking a permanent injunction must prove: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006))). Still, because we find that the other Plaintiff (McDonald) *does* meet those elements in his attack on the Hand-to-Hand Transmission Clause,[2] we see no problem granting the injunctive (and declaratory) relief *he* is seeking.

FINDINGS OF FACT

I.    BACKGROUND

A.    THE ORDINANCES

On May 1, 2012, the Fort Lauderdale City Commission enacted the Panhandling Ordinance, codified at § 16-82 of the City Code. *See generally* Pls.' Ex. 7 ("Panhandling Ordinance") [ECF No. 113-

---

[1] Messina's deposition was Plaintiffs' Exhibit 21 at trial. *See* Deposition of Mark Messina ("Messina Dep.") [ECF No. 113-13].

[2] As we'll soon see, however, neither Plaintiff has standing to challenge the Panhandling Ordinance.

3

6]. The Panhandling Ordinance bans two activities. *First*, it prohibits "panhandling" in certain *kinds* of locations throughout the City—at bus stops and transportation facilities; in parking lots and City parks; anywhere within 15 feet of sidewalk cafés, ATMs, or entrances to commercial or government buildings; and on private property. *See generally* Panhandling Ordinance at 1–2. The Ordinance defines "panhandling" as any request for "an immediate donation of money or thing of value" or an exchange in which one person receives an item of "little or no monetary value in exchange for a donation," such that "a reasonable person would understand that the transaction is in substance a donation." *Id.* at 1. Panhandling *doesn't* include "passively standing or sitting, performing music, or singing with a sign or other indication that a donation is being sought, but without any vocal request other than a response to an inquiry by another person." *Ibid.*

Second, the Panhandling Ordinance forbids "aggressive panhandling" *anywhere* within City limits. *Id.* at 2. "Aggressive panhandling" is a form of panhandling that includes: (1) approaching someone in a manner that would lead a "reasonable person to believe" that he is "being threatened with either imminent bodily injury or the commission of a criminal act upon the person"; (2) requesting a donation after a person has "given a negative response to the initial request"; (3) blocking individuals or groups from passage; (4) touching another without permission; or (5) "[e]ngaging in conduct that would reasonably be construed as intended to intimidate, compel or force a solicited person to accede to demands." *Id.* at 1.

On September 16, 2014, the Commission enacted the Right-of-Way Ordinance, codified at § 25-267 of the City Code. *See generally* Pls.' Ex. 9 ("Right-of-Way Ordinance") [ECF No. 113-8]. The Right-of-Way Ordinance identifies and regulates the "right-of-way canvasser or solicitor." This person

does any one of the following three things on a "right-of-way"[3]: He (1) "sells or offers for sale anything or service of any kind, or advertises for sale anything or service of any kind"; (2) seeks a "donation of any kind"; or (3) "personally hands to or seeks to transmit by hand or receive by hand anything or service of any kind" to a motorist on any street or roadway, whether the motorist's vehicle is temporarily stopped or not. *See* Right-of-Way Ordinance at 1. This is what we've called the "Hand-to-Hand Transmission Clause." The Right-of-Way Ordinance makes it illegal to act "as a right-of-way canvasser or solicitor"—that is, to engage in any of the three listed activities—on any portion of certain public rights-of-way. *Ibid.* The Right-of-Way Ordinance also makes it illegal "for any right-of-way canvasser or solicitor to hold, carry, possess, or use any sign or other device of any kind, within any portion of the public right-of-way[.]" *Ibid.* This is what we've called the Sign Provision. *See Messina v. City of Fort Lauderdale*, 546 F. Supp. 3d 1227, 1251 (S.D. Fla. 2021) (Altman, J.). The penalties for violating the Right-of-Way Ordinance are set forth in § 1-6 of the City Code and include fines of up to $500, a term of imprisonment of up to 60 days, or both. Right-of-Way Ordinance at 1–2.

## B. OUR PLAINTIFFS

Our Plaintiffs "are men of limited means." *Messina*, 546 F. Supp. 3d at 1231. Physical limitations have prevented them from obtaining traditional employment over the years. *See* Trial Tr. [ECF No. 119] at 44:7–10 ("Q. You [McDonald] work right now[?] A. No, I don't. Q. Why not? A. I got a bad back and a bad knee."); *see also* Messina Dep. at 13:1–4 ("Q. Why is it that you have not had employment since 2000? A. I was hit in the head. A man made an illegal left and hit me head on."). To make ends meet, therefore, both men have engaged in panhandling in the City. *See id.* at 44:17–18

---

[3] The term "right-of-way" is borrowed from § 25-97 of the City Code, and it means "the surface and space above and below any real property in which the city has an interest in law or equity, whether held in fee, or other estate or interest, or as a trustee for the public, including, but not limited to any public street, boulevard, road, highway, freeway, lane, alley, court, sidewalk, or bridge." CITY OF FORT LAUDERDALE, FLA., CODE OF ORDINANCES § 25-97 (2014).

("Q. Do you [McDonald] panhandle? A. Yes, I do."); *see also* Messina Dep. at 17:24–18:1 ("Q. Before you began receiving disability payments, what did you do for money? A. I would panhandle.").

Messina would typically stand on "the medians of the street[,] [b]ecause you could be seen by the cars better that way," Messina Dep. at 34:22–23, in "intersections," *id.* at 35:3, and on "sidewalks near intersections," *id.* at 35:3-4, because (according to him) that "is usually where you get the most help," *ibid.* McDonald also "mainly stand[s] in the median," Trial Tr. at 63:1—though, sometimes, he goes onto the "sidewalk and wait[s] for the flow of traffic to change," *id.* at 63:2–3.[4] Both would hold a sign while panhandling. *See* Messina Dep. at 18:5–9 ("Q. What do you mean by panhandling? A. I would hold a sign and then ask for help you know."); *see also* Trial. Tr. at 44:19–21 ("Q. [W]hat do you [McDonald] call it when you panhandle? What term do you use? A. Flying my sign. Q. What does the sign say? A. It says: 'Homeless, hungry, please, anything can help me.'").

The Plaintiffs preferred to panhandle at the City's major intersections because that's where they could communicate their message to the largest audience—and, as a result, receive more donations. *See* Messina's Interrogatory Answers [ECF No. 72-9] ¶ 11 (attesting that Messina panhandled on major roadways—including Broward Boulevard, Sunrise Boulevard, and Andrews Avenue—and at the intersections between them); *see also* McDonald's Interrogatory Answers [ECF

---

[4] On cross-examination at trial, McDonald admitted that one of his interrogatory responses wasn't completely accurate. In that interrogatory response, he'd said that he "utilized the sidewalk and edge of the shoulder of road to hold [his] sign[.]" Trial Tr. at 63:15–17. At trial, Mr. Burke (the City's attorney) asked McDonald whether he actually used each of "the sidewalk, the median, and the edge [of the] shoulder of the road to seek donations," *id.* at 64:9–10—and McDonald answered: "I didn't intend to, but I have [done] the edge of the road and the sidewalk as I was waiting to get - - to get back to the median," *id.* at 64:11–13. Mr. Burke followed up by asking whether it would be "very unusual to use the sidewalk or edge or shoulder of the road," *id.* at 64:14–15—and McDonald responded: "[Y]eah, that's unusual. It's not my method," *id.* at 64:16. Mr. Burke concluded by asking McDonald whether he was "[a]lways in the median[?]" *id.* at 64:17—and McDonald conceded: "Yeah, median - - mainly median," *id.* at 64:18, because the medians are "safe," *id.* at 64:21.

No. 72-7] ¶ 11 (answering that McDonald likewise panhandles on Broward and Sunrise Boulevards, on Interstate 95, on US 1, and on other popular City thoroughfares).

The Plaintiffs also said that they'd been harassed by City police officers while panhandling. *See* Messina Dep. 32:1–4 ("Q. Would you panhandle every day? A. Every day if I could, but with the police harassment like you know, I had to be very careful with where I did because I was afraid of being arrested."); *see also* Trial Tr. at 49:6–13 ("Q. Okay. Now, after you [McDonald] started panhandling more in Fort Lauderdale, did the police start to come by and tell you to stop? A. They would. Q. Okay. What would they do? A. . . . They say if they come back around, they're gonna take me to jail if I'm still around. So I leave."). While the Plaintiffs themselves haven't been arrested under the Ordinances, it's undisputed that the City has enforced the Ordinances against others. *See generally* Pls.' Ex. 2 ("Solicitation Arrest Forms") [ECF No. 113-1] (nearly 137 pages of citations, notices to appear, and arrest records—all reflecting arrests and detentions for violations of these Ordinances). The Plaintiffs also claimed that they would've panhandled more frequently were it not for the City's enforcement of the Ordinances. *See* Messina Dep. at 61:1–4 ("Because of the harassment I wouldn't have panhandled much, I would've [panhandled] probably six days a week. But because of the harassment and the fear, I would narrow it down more like two days a week."); *see also* Trial Tr. at 49:14–21 ("Q. Why would you [McDonald] leave? A. I don't want to go to jail. Q. Did you cut back in Fort Lauderdale? A. Yes, I did. Q. Did you want to panhandle more in Fort Lauderdale? A. Yes.").

## II.   PROCEDURAL HISTORY

### A.   OUR PRELIMINARY INJUNCTION ORDER

On June 23, 2021, we entered our Preliminary Injunction Order, in which we "preliminarily enjoined" the City "from enforcing §§ 16-82 and 25-267." *Messina*, 546 F. Supp. 3d at 1233. In that order—and in other rulings—we addressed two predicate issues that bear (again) on the questions presented here. Those two issues are: (1) the Plaintiffs' standing; and (2) the constitutionality of the

Hand-to-Hand Transmission Clause. We thus take a moment to reiterate what we've said before on these important questions.

### 1.   STANDING

We've twice found that the Plaintiffs have done enough to assert their standing to bring these claims—once when we denied the City's Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion to Dismiss") [ECF No. 12], and again when we rejected the City's "renewed attack" in our Preliminary Injunction Order, *see Messina*, 546 F. Supp. 3d at 1233–36. In those orders, we gave five reasons for our view that the Plaintiffs had met their standing obligations—albeit at those preliminary stages of the case.

*First*, we explained that Article III standing is "loosened" for First Amendment challenges to laws that are broadly applicable to the general public. *Id.* at 1234 (first citing *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001); and then citing *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 762 n.5 (11th Cir. 1991) ("[T]he broader the first amendment right and . . . the more likely it is that a governmental act will impinge on the first amendment, the more likely it is that the courts will find a justiciable case when confronted with a challenge to the governmental act.")).

*Second*, we found that the "Plaintiffs' specific claims of police harassment—coupled with their concrete allegations about personally seeing the police arrest *others* for panhandling—were more than sufficient to raise an inference at the pleading stage that their speech had been chilled and that they'd suffered an injury in fact." *Ibid.* (first citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "general factual allegations of injury" suffice at the pleading stage and that plaintiffs must bolster general claims with "specific facts" *only* at later stages of the case); and then citing *Bennett v. Spear*, 520 U.S. 154, 171 (1997) (noting that the burden of *pleading* standing is "relatively modest")).

*Third*, we observed that the Plaintiffs "didn't have to be arrested or prosecuted to raise a facial challenge to the Ordinances under the First Amendment; they only needed to do precisely as they did:

allege that they (1) intended to engage in the banned activity and (2) faced a credible threat of prosecution." *Ibid.* (citing *Pittman*, 267 F.3d at 1283–84 (holding that, to establish standing, "the plaintiff must show that he or she had an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution" (cleaned up))).

*Fourth*, we rejected the "near-frivolous argument" that the Plaintiffs' decision to continue panhandling thwarted their claims. *Ibid.* The concept of "chilled speech," we explained, isn't an "either-or" proposition. *Ibid.* It doesn't require the Plaintiffs to cease their protected activities entirely—so long as they can show that they reduced *the frequency* of their speech *because of* a credible fear of arrest. *Ibid.*[5] Since they'd alleged precisely that, we held, the Plaintiffs suffered (and have continued to suffer) an Article III injury. *Ibid.*

*Fifth*, we rebuffed the City's claim that the Plaintiffs lacked standing to advance a facial challenge against the Panhandling Ordinance's "aggressive panhandling" provisions merely because they "failed to allege that they engaged (or intended to engage) in conduct that falls within the ambit of those provisions" (*i.e.*, intimidating pedestrians or touching others without consent). *Id.* at 1234–35. We agreed with the City that the Plaintiffs hadn't alleged those things. But we held that they didn't need to. Instead, we said, they only had to show "that (1) they want to do certain things the 'aggressive panhandling' provisions arguably forbid, *and* that (2) their speech has been chilled because they fear prosecution." *Id.* at 1235–36. And (we concluded) it was "reasonable to infer" that the Plaintiffs had

---

[5] *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to [the threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."); *see also ACLU v. The Fla. Bar*, 999 F.2d 1486, 1494 n.13 (11th Cir. 1993) (explaining that a plaintiff must have an objectively reasonable belief about the likelihood of disciplinary action).

met those two elements, and that—as a result—they had "standing to advance their facial challenge to the 'aggressive panhandling' provisions." *Ibid.*

## 2.   THE HAND-TO-HAND TRANSMISSION CLAUSE

In our Preliminary Injunction Order, we recognized that panhandling is protected speech under the First Amendment. *See Id.* at 1237 (first citing *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (holding that a request for charity or gifts, whether "on the street or door to door," is protected First Amendment speech); then citing *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) ("There is no question that panhandling and solicitation of charitable contributions are protected speech."); and then citing *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("Like other charitable solicitation, begging is speech entitled to First Amendment protection.")).

We also acknowledged that the City may "regulate activities in 'traditional public fora' (*e.g.*, sidewalks and public parks)."[6] *Ibid.* But, we said, "the legality of any such regulation turns on its justification and the degree to which the regulation is tailored to that justification." *Ibid.* "The state's burden in this regard depends on the regulation's features." *Ibid.* "If the law limits speech based on its communicative content—sometimes referred to as a content-based restriction—then it is subject to strict scrutiny." *Ibid.* (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "Laws subject to strict scrutiny are 'presumptively unconstitutional,' which means that the government must prove that they are 'narrowly tailored to serve compelling state interests.'" *Ibid.* (quoting *Reed*, 576 U.S. at 163). "By contrast, a regulation imposing reasonable and content-*neutral* restrictions—on the time, place, or manner of speech—must withstand only intermediate scrutiny, which requires *both* that the regulation be narrowly tailored to serve a significant governmental interest *and* that it 'leave open ample

---

[6] *Cf. Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011) ("Traditional public fora are public areas such as streets and parks that, since 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983))).

alternative channels for communication of the information.'" *Ibid.* (first quoting *McCullen v. Coakley*, 573 U.S. 464, 477 (2014); and then quoting *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011) ("[A] time, place, and manner restriction can be placed on a traditional public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication." (cleaned up))).

We then applied that legal framework to the Ordinances. As to the Hand-to-Hand Transmission Clause, we agreed with the parties that it was "content neutral and subject to *intermediate* scrutiny." *Id.* at 1249. "[T]o survive intermediate scrutiny," we explained, "the City must show *both* that the provision is 'narrowly tailored to achieve a significant government interest' *and* that it 'leaves open ample alternative channels of communication.'" *Ibid.* (quoting *Bloedorn*, 631 F.3d at 1231 (cleaned up)). And, we added, the City "must demonstrate that it 'seriously undertook to address the problem with less intrusive tools readily available to it' and 'considered different methods that other jurisdictions have found effective.'" *Ibid.* (quoting *McCullen*, 573 U.S. at 494).

At that point in the case, however, the City hadn't submitted *any* evidence in support of the Right-of-Way Ordinance (which includes the Hand-to-Hand Transmission Clause). It "simply 'operated under the premise' that it could promote traffic safety by extending the Right-of-Way Ordinance to arterial roads, which are 'heavily travelled and operating beyond their capacity.'" *Ibid.* (quoting the City's Supplemental Response to Plaintiff's Motion for Preliminary Injunction (the "City's Supplemental PI Br.") [ECF No. 40] at 2 (cleaned up)). The City had just *assumed*, in other words, that "prohibiting solicitors from interacting with motorists engaged in travel, either from a median, sidewalk, or roadway itself, furthers the City's interest in trying to maintain or improve traffic flow on these overcapacity and heavily travelled roadway segments." *Ibid.* (citing the City's Supplemental PI Br. at 3). Those "aren't entirely unreasonable assumptions," we acknowledged, but "they're just that—*assumptions*." *Ibid.* We thus warned the City that, come summary judgment, it "must

point to some evidence (*e.g.*, traffic reports, baseline studies, citizen complaints, etc.) that its Ordinance was justified by some significant government interest." *Id.* at 1250.

We emphasized the need for the City to produce evidence for two reasons. *One*, as we pointed out, "the City's premises aren't unassailable, even if they aren't facially unreasonable." *Ibid.* To prove this point, we devised three plausible scenarios in which the Hand-to-Hand Transmission Clause would fail intermediate scrutiny:

> For example, it may be, as the Plaintiffs suggest, that a person lawfully standing on the sidewalk who accepts a donation from a motorist who is stopped at a light in the lane next to the sidewalk poses no greater danger than a person standing on the sidewalk who is holding a sign. Or it may be that there's never been a single accident in the City involving (or caused by) a hand-to-hand exchange between a panhandler and a temporarily stopped motorist. Or it may be that accidents have happened only when the panhandler walks out into the middle of the street, whereas hand-to-hand exchanges from the *sidewalk* have proven to be relatively safe. In any of these three (quite reasonable) scenarios, the City would have had less intrusive ways of promoting traffic safety. And, as should be obvious, under any of these three hypotheticals, our law would be both over- and under-inclusive: over-inclusive because it penalizes panhandlers whose conduct is not dangerous; under-inclusive because it punishes only the panhandler and not the driver.

*Ibid.* (cleaned up). *Two*, as we explained, the "lack of *any* evidence to justify the law . . . seemed to confirm the Plaintiffs' view that the City operated off of assumptions and didn't (as the Supreme Court requires) seriously endeavor to address the problem with less intrusive tools readily available to it." *Ibid.* (cleaned up).

"For those two reasons," we concluded that the Plaintiffs were likely to succeed on the merits of their challenge to the Hand-to-Hand Transmission Clause. *Ibid.* In saying so, we distinguished *Cosac Foundation v. City of Pembroke Pines*—where Judge Rosenbaum upheld an essentially identical ordinance—because the city there had "presented sufficient evidence . . . to conclude that prohibiting roadway canvassing and solicitation on its busiest streets would improve motorist and pedestrian safety and traffic flow." 2013 WL 5345817, at *18 (S.D. Fla. Sept. 21, 2013) (Rosenbaum, J.).

### B.  OUR SUMMARY-JUDGMENT ORDER

On August 18, 2022, we granted in part the Plaintiffs' Motion for Partial Summary Judgment "as to those parts of the Ordinances the City [didn't] defend." MSJ Order at 3. As relevant here, the City didn't "contest the entry of a declaratory judgment invalidating, and a permanent injunction enjoining enforcement of, the 'Selling and Advertising or Requesting Donations' and the 'Sign' portions of the Right-of-Way Ordinance." *Ibid.* (quoting MSJ Response at 2). So, we declared the Selling and Advertising and Requesting Donations Provision of the Right-of-Way Ordinance (§ 25-267(a)) and the Sign Provision of the Right-of-Way Ordinance (§ 25-267(d)) "unconstitutional and . . . enjoin[ed] the City from enforcing them." *Ibid.* At that point—at least as to the Right-of-Way Ordinance—only the question of the constitutionality of the Hand-to-Hand Transmission Clause remained.[7]

And, as to that provision, we said—after reviewing "six pieces of evidence [the City] failed to include in its response to the Plaintiffs' preliminary-injunction motion"—that the City had "raised a genuine issue of material fact *both* as to whether the Hand-to-Hand Transmission Clause furthers a significant government interest (in traffic safety and traffic reduction) *and* as to whether it leaves open ample alternative channels of communication." *Ibid.* (citing *Smith*, 177 F.3d at 956 ("Even in a public forum, the government may 'enforce regulations of the time, place, and manner of expression which [1] are content-neutral, [2] are narrowly tailored to serve a significant government interest, and [3] leave open ample alternative channels of communication." (quoting *Perry Educ. Ass'n v. Perry Loc.*

---

[7] Our Summary Judgment Order didn't explicitly enjoin the City from enforcing the Panhandling Ordinance or declare it unconstitutional. *See generally* MSJ Order. That was probably a mistake on our part, but that's the record we have. And our preliminary injunction as to that Ordinance, *see Messina*, 546 F. Supp. 3d at 1254 ("The City is preliminarily enjoined from enforcing [§] 16-82[.]" (emphasis omitted)), has since been dissolved, *see* Order Partially Dissolving Preliminary Injunction as to Code § 16-82 [ECF No. 112]. Because we've determined that the Plaintiffs lack standing to challenge the Panhandling Ordinance—more on this later—there's thus nothing preventing us from dismissing the Plaintiffs' challenge to that Ordinance.

*Educators' Ass'n*, 460 U.S. 37, 45 (1983)))). We therefore left "these disputed factual issues" for trial. *Id.* at 3.

### C. THE CITY'S TRIAL EVIDENCE

The City points to several documents it says it relied on before it promulgated the Right-of-Way Ordinance (and, therefore, the Hand-to-Hand Transmission Clause). We'll go through each document in turn—starting with "Memorandum No. 14-33 dated May 19, 2014." Def.'s Ex. 15 ("Traffic Memo") [ECF No. 114-3] at 5–11. It's a memo written by Alia Awwad (a professional engineer and transportation planner for the City) to then-City Manager Lee Feldman regarding "Crashes at Major Intersections and Interstate Ramps, Traffic Congestion, and Distracted Driving." The Traffic Memo includes several appendices, detailing the car accidents that occurred at various City intersections (and interchange ramps) between 2011 and 2013. It also lays out traffic-congestion data (over the same timeframe) for some of the City's main roads.

The Traffic Memo includes a second (earlier) memo—also written by Awwad to Feldman. This earlier memo—which we'll call the "Street Solicitation Memo"—is dated January 8, 2014, and is titled "Impacts of Street Solicitation on Public Safety and Traffic Operations." Def.'s Ex. 15 ("Street Solicitation Memo") [ECF No. 114-3] at 13–16. The Street Solicitation Memo is perhaps the most important piece of evidence the City has produced on this issue. It sets out to address "the potential impacts of street vendor solicitation on traffic safety and operations." *Id.* at 13. Awwad defines "street solicitation" as "the sales, donation requests, and the exhibition and storage of merchandise within the public right-of-way." *Ibid.* And she outlines several reasons for her view that street solicitation harms drivers and pedestrians: "Street solicitation," she says, "prompts unpredictable pedestrian behavior that impacts the health and welfare of the general public. As street vendors dart into traffic, stand in medians, cross at non-controlled locations, walk along travel lanes, and solicit driver attention from sidewalks, they are exposed to hazardous traffic conditions and also cause driver distraction,

leading to an increase rate of traffic crashes." *Ibid.* Street solicitation "also leads to distracted driving," *id.* at 14,[8] she wrote, "which in turn can cause serious traffic crashes, including pedestrian, rear-end, and roadway departure collisions," *ibid.* "Additionally," she explained, "street solicitation increases traffic congestion." *Id.* at 15.

Unfortunately (and at the risk of getting ahead of ourselves), the underlying data *doesn't* support Awwad's opinions—at least as they relate to street solicitation. Instead, the data shows that, at the time the Right-of-Way Ordinance was passed, the City's drivers and pedestrians were suffering from *other* problems—like distracted driving, jaywalking, and traffic congestion. So, for instance, Awwad cites a report of the National Highway Traffic Safety Administration ("NHTSA")—which the City elected not to submit here—for the proposition that, in 2012, "*Florida* had the third highest number of total [traffic-related] fatalities behind Texas and California." *Id.* at 13 (emphasis added). But that fact, even if true, doesn't tell us whether *street solicitation* caused any of those fatalities—much less whether some significant number of those fatalities occurred *within the City*. Similarly, Awwad cites guidance from the Federal Highway Administration ("FHA")—also not filed with us—which identified the City as a "pedestrian focus city for having a pedestrian fatality rate that is above the national average." *Ibid.* But, again, this tells us nothing about whether *street solicitors* have caused (or even been involved in) the City's high "pedestrian fatality rate." Here's one more: Awwad notes that "5,474 people were killed and another 448,000 were injured across the U.S. due to distracted driving," *id.* at 14, and (she adds) traffic congestion—as measured by Annual Average Daily Traffic ("AADT") and Level of Service ("LOS") data—is high throughout the City's arterial roads, *id.* at 15–16. Again,

---

[8] According to Awwad, the Florida Department of Transportation ("FDOT") defines distracted driving as "driving typified by any mental or physical activity that takes the driver's focus off the task of driving . . . by electronic communication devices[,] . . . other distraction inside the vehicle, external distraction (outside the vehicle), texting or general attentiveness." Street Solicitation Memo at 14. Based on this definition, Awwad says that "street solicitation falls within the FDOT definition of potentially causing distracted driving." *Ibid.*

however, neither of these facts—the number of people killed and injured *across the country* due to distracted driving and the degree of congestion on the City's roads—identifies *street solicitation* in *the City* as a potential cause of these problems. And yet, from these inapposite data points, Awwad somehow draws the following conclusion:

> In conclusion, from a traffic safety and operations perspective, street solicitation adversely impacts transportation activities within the public rights-of-way. Based on the above statistics and analysis, my opinion is that street solicitation poses a public safety hazard, endangering vendors and all road users. Traffic flow is also impeded by street solicitation, particularly in congested and peak travel conditions.

*Id.* at 16.

Awwad's later Traffic Memo follows a similar pattern. "This memorandum," Awwad writes, "expands upon public safety issues in the City, specifically crashes at major intersections and interchange ramps and the correlation between crashes, congestion, and distracted driving." Traffic Memo at 5. That's true: The City compiled "[c]rash statistics at major intersections in the City . . . for the years 2011–2013." *Ibid.* But, as with the Street Solicitation Memo, none of the Traffic Memo's data tells us anything about the effect of street solicitation on crashes, injuries, or fatalities within the City. Despite this absence of evidence, Awwad's Traffic Memo essentially regurgitates the street-solicitation opinions she'd outlined in the earlier Street Solicitation Memo. *See id.* at 6 ("Street solicitation exposes street vendors to potential crashes."); *see also id.* at 11 ("As indicated in the previous memo, street vendor solicitation, which prompts unpredictable pedestrian behavior, contributes to distracted driving and leads to traffic crashes, especially in high-conflict points such as major intersections and interchange ramps."). The Traffic Memo's final paragraph detailed the large-scale problems the City was hoping to solve. As Awwad explains, "[t]he traffic crash statistics presented in this memo illustrate the magnitude and gravity of traffic crashes, congestion, and distracted driving in the City of Fort Lauderdale. Proactive countermeasures, including enforcement, education, and other policies need to be implemented to alleviate the issues and reduce these largely preventable crashes." *Ibid.*

16

The third document the City relies on is a memo by Feldman (the City Manager) to the City's Mayor and the City Commission on September 3, 2014. *See generally* Def.'s Ex. 15 ("Feldman Memo") [ECF No. 114-3] at 1–4. The Feldman Memo doesn't add much to our analysis: It's based on the same inapposite data Awwad analyzed, and it repeats her (untethered) conclusions. *See* Feldman Memo at 2 ("'Street vendor solicitation, which prompts unpredictable pedestrian behavior, contributes to distracted driving and leads to traffic crashes, especially in high-conflict points such as major intersections and interchange ramps.'" (quoting Traffic Memo at 11)).

In one respect, though, the Feldman Memo stands out: It identifies a separate interest—apart from the City's cited interests in traffic safety and efficiency—the Right-of-Way Ordinance was designed to promote: reducing homelessness. Here's what the Memo says about this:

> **<u>Strategic Connections</u>:**
> This item is a *Commission Annual Action Plan* priority, included within the Policy Agenda, advancing the Comprehensive Homeless Strategy.
>
> The item is a Press Play Fort Lauderdale Strategic Plan 2018 initiative, included within the Public Places Cylinder of Excellence, specifically advancing:
>
> - **Goal 3**: Be a community that finds opportunities and leverages partnerships to create unique, inviting and connected gathering places that highlight our beaches, waterways, urban areas, and parks.
>
> - **Objective 5**: Work with partners to reduce homelessness by promoting independence and self-worth through advocacy, housing, and comprehensive services.
>
> - **Initiative 2**: Implement a comprehensive short and long-term strategy with community partners to address Homelessness[.]
>
> This item also furthers the *Fast Forward Lauderdale 2035 Vision Plan*: We are Community.

*Id.* at 3–4.

Two things about this. *One*, the City has never suggested that the Hand-to-Hand Transmission Clause survives constitutional scrutiny *because* it advances the City's significant interest in reducing

homelessness. It's thus forfeited any such argument. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue[.]"); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). *Two*, even if the City had made this argument (whether at summary judgment or at trial), nothing in the Feldman Memo—or anywhere else—would support the City's view that the Clause furthers any interest in homelessness reduction. There's no evidence, for instance, that homeless people are more likely to engage in the kinds of hand-to-hand exchanges the Clause prohibits,[9] or that the hand-to-hand ban would somehow encourage homeless folks to seek other employment. Whether the Right-of-Way Ordinance was *really* aimed at homeless people is, therefore, neither here nor there.

Along with these three memoranda, the City submitted two maps: the *first*, a color-coded map called the "Daily Level of Service 2012 Map," Def.'s Ex. 15 ("Daily Level of Service Map") [ECF No. 114-3] at 33, which the Right-of-Way Ordinance incorporates; the *second*, a copy of the "Peak Level of

---

[9] That may be a commonsense inference. But, at trial, the City had to produce some evidence to support that inference—and they did not. In any event, if the City *had* established this connection—*viz.*, that homeless people are more likely to engage in the kinds of hand-to-hand transactions the Clause prohibits—then the Plaintiffs would've had a powerful argument that the Clause is actually content-based. That's because, in that scenario, Feldman (the City Manager) would've been pushing a law that predominantly targets the speech activities of homeless (as opposed to other) people *See, e.g., United States v. Eichman,* 496 U.S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted *interest* is 'related to the suppression of free expression.'" (quoting *Texas v. Johnson*, 491 U.S. 397, 410 (1989) (cleaned up))).

Service 2012 Map," Def.'s Ex. 15 ("Peak Level of Service Map") [ECF No. 114-3] at 34. These maps give us some (mostly inapposite) traffic-congestion data—inapposite precisely because, like the Awwad and Feldman memos, they tell us *nothing* about whether higher congestion levels are linked to the presence of street solicitors. In fact, like the earlier memos, these maps never mention street solicitation *at all*—and they never even try to identify the areas within the City where street solicitors are most prevalent.

Finally, while we've covered the Ordinance itself, with an emphasis on the Hand-to-Hand Transmission Clause, we've yet to review its *preamble*, which reads:

> WHEREAS, the City Commission of the City of Fort Lauderdale has a significant interest in protecting the health, safety and welfare of the pedestrians and motorists in the City; and
>
> WHEREAS, the City Commission finds that use of the public right-of-way for solicitation of donations or for the storage, sale or exhibition of merchandise and materials can pose significant hazards to the solicitors, other pedestrians and motorists; and
>
> WHEREAS, solicitors create a safety hazard for themselves and the motorists when entering upon public streets, distributing items to vehicle occupants, or receiving money or other items from vehicle occupants; and
>
> WHEREAS, distraction of motorists occasioned by solicitations or by the storage or exhibition of goods and materials in the right-of-way impedes the safe and orderly flow of traffic, causes vehicles to stop unexpectedly, causes vehicles to linger at traffic control devices, and causes motorists to fail to attend to driving; and
>
> WHEREAS, distracted drivers pose a significant risk of physical injury to other motorists and pedestrians; and
>
> WHEREAS, roads are primarily designed for vehicular traffic and are not suited to safely accommodate right-of-way canvassers and solicitors; and
>
> WHEREAS, according to the Florida Department of Highway Safety and Motor vehicles traffic Crash Facts 2012 Annual Report, 473 pedestrians were killed on Florida roadways in 2007; 58 of those pedestrians were killed on roadways in Broward County; and
>
> WHEREAS, in the City of Fort Lauderdale, approximately 140 pedestrians were involved in traffic accidents in 2012 and 154 pedestrians were involved in traffic accidents in 2013, revealing an increase in pedestrian and vehicle crashes; and

WHEREAS, public health, safety and welfare requires the imposition of reasonable manner and place restrictions on solicitation and the storage and exhibition of goods and other materials in the public right-of-way, while respecting the constitutional right of free speech for all citizens; and

WHEREAS, such regulations are necessary in order to prevent dangers to persons and property, and to prevent delays and interference with vehicular traffic flow; and

WHEREAS, it is necessary and appropriate to create Chapter 25, Article XI of the Code of Ordinances to address the concerns identified herein;

NOW, THEREFORE, BE IT ORDAINED BY THE CITY COMMISSION OF THE CITY OF FORT LAUDERDALE, FLORDA: . . . .

Pls.' Ex. 8 ("Right-of-Way Ordinance Preamble") [ECF No. 113-7] at 1–2.

At summary judgment, the parties agreed that "[t]he City cannot cite a single accident or incident for the two-year period prior to the passage of [the Right-of-Way Ordinance] of a pedestrian injury of a person who was engaged in roadway solicitation." Plaintiffs' Statement of Material Facts in Support of the Plaintiffs' Motion for Summary Judgment as to Liability ("PSOMF") [ECF No. 67] ¶ 7; *see also* Defendant City's Statement of Material Facts ("DSOMF") [ECF No. 71] ¶ 7 ("Not disputed."). Nor can the City "cite a single accident or incident for the two-year period prior to the passage of [the Right-of-Way Ordinance] where a person who was engaged in roadway solicitation caused or contributed to a motor vehicle accident." PSOMF ¶ 8; *see also* DSOMF ¶ 8 ("Not disputed."). The City admits that it "does not have in its possession the traffic crash reports for the two year period prior to September 2014." DSOMF ¶¶ 7–8. And it hasn't supplied any crash reports for the eight-or-so years since. At trial, we asked the City about this absence of pre-enactment evidence. As before, the City conceded that it didn't have any: "I would agree with the Court," the City's lawyer said, "that [the City] does not have any statistics from that which was reviewed as to whether or not a pedestrian accident involved a solicitor. Or whether or not it involved a driver who was distracted by the actions of a solicitor either in striking a motor vehicle or a pedestrian." Trial Tr. at 29:12–20.

The City also relied on three witnesses at trial: Benjamin Rogers (the City's "Director of Transportation and Mobility"), *id.* at 70:19; Benjamin Restrepo (the City's "senior project manager" at the "Department of Sustainable Development"), *id.* at 81:7–12; and Wesley Acosta (a "Senior Management Analyst"), *id.* at 99:1. We'll summarize the testimony of each in turn.

Rogers (whom the Plaintiffs elected not to cross examine) was only asked to explain the Daily Level of Service Map, *see id.* at 73:8–9, and to define what an "arterial roadway" was—a "primary road," he said, "that connect[s] areas," such as "cities or areas across the city," and which, as a result, typically have "high demand, high utilization, and [a] higher speed limit," *id.* at 74:7–10. Rogers testified that the Daily Level of Service Map highlights all arterial roadways—*i.e.*, roadways that have a level of service of D, E, or F and are covered by the Right-of-Way Ordinance—in "blue, pink, and red." *Id.* at 74:19–22. This distinguishes them from the roads "delineat[ed]" in "yellow," which have a "level of service of C" and "are not roads that are subject to the regulation." *Id.* at 75:5–10.

Benjamin Restrepo then helped us understand *how* these roads are classified. He testified about the "levels of service classifications for roadways" in the City, *id.* at 83:9, and explained that a "'level of service' is a qualitative measure to measure average delay along the corridor or [at] an intersection. The methodology is set up by the Highway Capacity Manual, and the Highway Capacity Manual is published by the Transportation Research Board. The state, [and] the county, use that methodology to determine the level of service through . . . an intersection, along a corridor, and they evaluate that by taking turning movement or counts [*i.e.*, counting vehicles going through an intersection]," *id.* at 83:21–85:3. "[A]fter the data is collected of the turning movement counts at the intersection or the daily traffic through a corridor," he continued, "we use the high-rate capacity . . . as the . . . traffic engineering world, we use the raw data to evaluate the level of service through an intersection or along corridor." *Id.* at 85:7–12. When counsel showed Restrepo Defendant's Exhibit 15, he confirmed that Alia Awwad had drafted the Street Solicitation Memo. *See id.* at 88:3–4. He also confirmed that the

"letter next to" the "LOS abbreviations" Awwad included in her memo referred "to the classification" (*i.e.*, LOS A, LOS B, LOS C, LOS D, LOS E, and LOS F). *See id.* at 86:11–21. And he said that *either* "the state, the Broward Metropolitan Planning Organization," *or* "Broward [C]ounty" determines "the level of service that [the] arterial roadway has based on" the methodology he described earlier. *Id.* at 87:4–10.

Counsel then showed Restrepo the Peak Level of Service Map and asked whether he had "attempted to perform a calculation to determine in some relative way the amount of roads which are regulated by 25-267 and the amount of roads that are not[.]" *Id.* at 89:5–7. Restrepo answered that he took "the total mileage of [the City's] roads and [ ] streets . . . within the limits of the City of Fort Lauderdale, and [ ] was able to come up with a percentage of how many roadways are classified as arterials and which are a level of service of D or worse and figure out how many of those roadways would be considered to be under this ordinance." *Id.* at 89:10–15. In the end, "[a]bout 7 percent of the roadway miles in the City of Fort Lauderdale . . . would be held up to this ordinance and 93 [percent] would not." *Id.* at 89:19–21. In fact, not every "local road[ ]," "collector road[ ]," or "arterial road" is "covered by the ordinance." *Id.* at 89:24–90:6. In short, of the "809 miles" of roadway in the City, about "58 miles of roadway" are subject to this Ordinance. *Id.* at 95:11–16.

On cross-examination, the Plaintiffs' lawyer asked Restrepo whether he was ever "involved in any presentation of any information or submission of any reports or data *at the time this ordinance was passed*," *see id.* at 96:2–4 (emphasis added), and he admitted that he "was not," *id.* at 96:5. "Nor [was he] involved . . . with the preparation of the documents that consist of Defense Exhibit Number 15." *Id.* at 96:6–9. Restrepo also agreed with counsel that the "809 number is the number . . . of total miles of roadway" and "doesn't tell us the number of intersections within those 809 miles[.]" *Id.* at 96:10–16.

The City's last witness, Wesley Acosta, reaffirmed a major problem with the City's evidence: None of the data available to the City on pedestrian-related accidents includes *any* metric that tracks what the pedestrian was doing at the time of the accident. Acosta was asked whether, in connection with this case, he had been "asked to gather" information "concerning accidents within city limits involving a pedestrian or on adjacent roadways with a Broward County Metropolitan Planning Organization roadway 2012 peak level of service designation of D, E, or F [roads subject to the Ordinance]" for the two years before the enactment of the Ordinance—"September 16, 2012, to September 16, 2014." *Id.* at 99:24–100:4. He said that he had, *id.* at 100:5, and explained that he'd used Florida's "database called Signal Four Analytics" to catalog the accidents' "date and time . . . , the intersection where the accident took place, a brief description of the accident, law enforcement agency documenting the accident, title and document number of the document recording the accident," *id.* at 100:6–16. Acosta put this information into an "Excel spreadsheet," *id.* at 100:25, which was admitted into evidence as Plaintiffs' Exhibit 18 (filed conventionally). But *none* of this data—which consists of 277 pedestrian-related accidents, each broken out over 73 columns tracking various details of those accidents—tells us *anything* about what the pedestrian was doing when the accident occurred. Here's Acosta confirming this point:

> Q.    Let me ask you this. With regard to the data that you can access about pedestrian . . . accidents - - do you recall about how many data fields are available there?
>
> A.    Uhm, . . . yeah. There's roughly maybe between 30 and 40 data points that it collects.
>
> Q.    Okay. And do any of those data points that you have access to - - do any of them describe what the purpose of the pedestrian was - - in other words, whether they were jaywalking, going shopping, soliciting donations, anything related to the purpose of their actions?
>
> A.    No.

Q:     So, for instance, are you, through this database, able to ascertain how many pedestrian [accidents] involved someone who was soliciting donations as opposed to a pedestrian who had some other purpose at the time of the accident?

A.     No.

*Id.* at 101:4–20.

In describing the information the data *does* include, Acosta testified that it tracks "weather conditions[,] if the driver was impaired, the location of the accident, date, time, any fatalities or injuries. You would pull something like first harmful event, which means basically what was the first damage-inducing point of the accident. It includes a lot more information than that, yeah." *Id.* at 102:6–12. But, when asked again whether "[a]ny of that include[s] something that would tell us whether the person involved in the accident was standing on a median soliciting donations at the time of the accident," Acosta admitted that it does not ("No," he said). *Id.* at 102:13–16.[10]

On cross-examination, Acosta confirmed that the Excel spreadsheet he'd prepared (Pls.' Ex. 18) included *only* information collected *either* by police officers *or* by public-service aides who reported to the accident scenes. *See id.* at 116:7–119:7. Acosta also said that, "back then," *id.* at 120:1—meaning

---

[10] Acosta also discussed the work he performed in support of the City's 2022 amendment to the Right-of-Way Ordinance—by which the City added six intersections to the total number of roadways that had originally been included in the 2014 Ordinance. *See* Trial Tr. at 102:17–23 ("Q. The City has recently amended ordinance - - code Section 25-267, has it not? A. I believe so. Q. Were you asked to do some work related to that recent amendment? A. I was asked to put together an analysis on the crash densities at the major intersection[s]."). Noting, however, that the City didn't submit any of Acosta's reports or notes into evidence, we were concerned that "there's an oddity to the way that the direct [examination] ended, because [the City] was talking about codes and colors, and none of that's in evidence." *Id.* at 112:15–19. Fortunately, the Plaintiffs' counsel agreed that his clients' "claim for prospective injunctive relief will be limited to the roadway segments, including 14 of the intersections, which are part of the D, E, and F level of service classifications under the 2014 ordinance which was challenged initially. And the [P]laintiffs are not seeking any prospective relief as it pertains to the six additional intersections which have been added to the new recently amended ordinance." *Id.* at 114:3–12. Hearing this concession, the City's counsel asked us to strike Acosta's testimony about the work he did in support of the 2022 amendment, *id.* at 115:5–11—and we agreed, *see id.* at 115:12–14 ("Everything other than [the kinds of data available] and, of course, his background will be stricken."). So, most of Acosta's testimony about the 2022 amendment was stricken (with the City's consent) and is irrelevant here.

24

"September of 2012 to September 2014"—the underlying accident reports that contained the data he used in his spreadsheet existed in "hard form," *id.* at 119:23–25. The Plaintiffs then concluded their cross by asking whether those reports "were reviewed or analyzed [in] regard to this case by any senior analyst," *id.* at 120:4–6, and Acosta conceded that they had not been, *id.* at 120:6. On redirect, the City asked Acosta whether those physical versions of the accident reports (beginning in 2012 and running through 2014) would have been "available to the City . . . in 2021," *see id.* at 120:13–16, and Acosta answered: "No," *id.* at 120:17.

The City also submitted three arrest records, showing that McDonald had been arrested three separate times by the Broward County Sheriff's Office for street solicitation in Pompano Beach (a different city in Broward County). *See generally* Def.'s Ex. 40 [ECF No. 114-4] (Aug. 10, 2018, Pompano Beach arrest of McDonald for "Street Solicitation"); Def.'s Ex. 42 [ECF No. 114-5] (Sept. 5, 2018, Pompano Beach arrest of McDonald for "Resist[ing] [an] Officer-Obstruction [without] Violence" and "Soliciting"); Def.'s Ex. 44 [ECF No. 114-6] (Sept. 26, 2020, Pompano Beach arrest of McDonald for "Resist[ing] [an] Officer-Obstruction [without] Violence," "Obstruction of Right of Way," and "Obstruction of Mass Transit" while "walking through traffic . . . and holding up a sign advising that he was homeless and requesting money").

Finally, the City introduced the Commission Meeting Minutes for two dates: September 3, 2014, *see generally* Def.'s Ex. 6 [ECF No. 114-1], and September 16, 2014, *see generally* Def.'s Ex. 7 [ECF No. 114-2]. But the City never explained why these meeting minutes are important or how they bear on the issues in this case. And, having reviewed those minutes, we really have no idea.

One last thing. Before the trial began, the City filed a Motion to Dissolve the Injunction as to Code §§ 16-82 and 25-267 (the "Motion to Dissolve") [ECF No. 103]. In that motion, the City noted that it had repealed the Panhandling Ordinance and had no intention of enforcing or "readopt[ing] the unconstitutional language" in that provision. *Id.* at 3–4. The Plaintiffs didn't oppose that part of

the Motion to Dissolve. *See* Plaintiffs' Response to the Motion to Dissolve [ECF No. 109] at 2. But

they interpreted the Motion to Dissolve as also asking us "to dissolve the preliminary injunction as to

the Hand-to-Hand Transmission provision." *Id.* at 6. So, we initially denied the Motion to Dissolve

*without prejudice* and directed the City to refile it after trial. *See* Paperless Order Denying the Motion to

Dissolve [ECF No. 110].

At the trial, we asked the lawyers about the extent to which the City's repeal of the Panhandling

Ordinance affected the Plaintiffs' claims for injunctive and declaratory relief. Here's that discussion:

> MR. BURKE: Your Honor, as you know, the case here deals with two city ordinances. The first is what we've been referring to as a panhandling ordinance found at 16-82 of the city code. The Court, in June of 2021, entered a preliminary injunction, which enjoined the enforcement of that ordinance. That ordinance was repealed in its entirety on September 6, 2022, and replaced, using the same code section, 16-82, but with entirely different regulations. The plaintiffs' attorneys, we've spoken about the issue of prospective injunctive and declaratory relief, and I believe that the plaintiffs' attorneys have indicated to me they will not seek that with respect to that ordinance.
>
> THE COURT: Okay. And so as to that ordinance -- I was going to ask both of you, and maybe this is a good time -- there was a motion to dissolve the injunction with respect to that ordinance anyway.
>
> MR. BURKE: Yes.
>
> THE COURT: I see no reason not to dissolve it, although it's kind of weird to have an injunction with respect to an ordinance that no longer exists. Mr. Taseff, what's your view of that? I thought you had [ac]ceded to that.
>
> MR. TASEFF: That's correct. We don't oppose it.
>
> THE COURT: All right. So I will enter an order, then, dissolving the injunction as to that provision. . . .
>
> MR. TASEFF: Judge, you know, I'm sorry to interrupt, and I don't think I am necessarily, but I want to make clear that we're seeking damages --
>
> THE COURT: I understand. We're talking about the injunction and prospective relief.
>
> MR. TASEFF: I agree, if I wasn't clear.

26

Trial Tr. at 24:4–25:10. We then granted the City's unopposed *ore tenus* motion and dissolved the preliminary injunction we had entered as to the Panhandling Ordinance. *See* Order Partially Dissolving Preliminary Injunction as to Code § 16-82 [ECF No. 112] at 1.

CONCLUSIONS OF LAW

## I.     ARTICLE III STANDING

We'll start with an issue we've discussed several times already: whether the Plaintiffs have standing to assert their constitutional claims. The law is clear that, "[i]n the First-Amendment realm, plaintiffs do not have to expose themselves to enforcement in order to challenge a law." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (cleaned up). "Rather, an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Ibid.* (cleaned up). "[I]n a pre-enforcement constitutional challenge, the injury-in-fact requirement can be satisfied by establishing 'a realistic danger of sustaining direct injury' from 'the statute's operation or enforcement.'" *W. Va. ex rel. Morrisey v. U.S. Dep't of the Treas.*, 59 F.4th 1124, 1137 (11th Cir. 2023) (quoting *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012). "A plaintiff must establish '(1) that he has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) that his conduct is arguably proscribed, and (3) that he is subject to a credible threat of enforcement.'" *Ibid.* (quoting *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119–20 (11th Cir. 2022)).

"[I]n some cases," though, "the authentic interest of the plaintiff in engaging in the prohibited conduct can establish standing even though the only threat of enforcement comes from the very existence of the statute." *Leverett v. City of Pinellas Park*, 775 F.2d 1536, 1539 (11th Cir. 1985); *see also Speech First, Inc.*, 32 F.4th at 1120 ("Accordingly, to determine whether a First Amendment plaintiff has standing, we simply ask whether the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct

prohibition against the exercise of First Amendment rights[.]" (cleaned up)). For this reason, the Eleventh Circuit has described the credible-threat-of-prosecution standard in First Amendment cases as "quite forgiving." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017). The Eleventh Circuit has "stressed that '[w]here the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual prosecution.'" *Speech First, Inc.*, 32 F.4th at 1120 (quoting *Wollschlaeger*, 848 F.3d at 1305); *see also ibid.* ("We have long emphasized that the injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." (cleaned up)).

For two reasons, the Plaintiffs have met that lenient standard with respect to the Hand-to-Hand Transmission Clause. *First*, both Messina and McDonald have testified about their "intention to engage in a course of conduct arguably affected with a constitutional interest," and they've shown that their "conduct is arguably proscribed." *Morrisey*, 59 F.4th at 1137. The Hand-to Hand Transmission Clause makes it illegal to seek a "donation of any kind" on a public right-of-way from "any person who operates or occupies a motor vehicle of any kind, which vehicle is engaged in travel on or within any portion of any of the streets or roadways in the city, whether or not such vehicle is temporarily stopped in the travel lanes of the road." Right-of-Way Ordinance at 1. Here, both Plaintiffs testified (McDonald at trial and Messina in his deposition), not only that they've panhandled at covered locations regularly, *see* Messina Dep. at 53:12–13 ("[W]hen you work the medians, that's, you know, it's the cars that you're, you know, asking."); Trial Tr. at 46:3–7 ("Q. And how is it [motorists] indicate to you [McDonald] that they want to give you a donation? A. They'll -- they'll either honk their horn, or if I walk by their car, a lot of them tap on their windows and tell me . . . they're gonna give me something." ), but also that, were it not for the law, they would've panhandled at those locations *more*, *see* Messina Dep. at 61:1–4 ("Because of the harassment I wouldn't have

panhandled much, I would've [panhandled] probably six days a week. But because of the harassment and the fear, I would narrow it down more like two days a week."); *see also* Trial Tr. at 49:14–21 ("Q. All right. Why would you [McDonald] leave? A. I don't want to go to jail. Q. Did you cut back in Fort Lauderdale? A. Yes, I did. Q. Did you want to panhandle more in Fort Lauderdale? A. Yes.").

*Second*, the Plaintiffs have offered evidence for their view that they're "subject to a credible threat of enforcement." *Morrisey*, 59 F.4th at 1137. Specifically, they said that they've been harassed by police officers while panhandling in the City. Messina, for instance, testified that:

> [The police] would always holler at me from a distance you know, they have . . . those loudspeakers that are real loud. And they would call out on the loudspeaker do that horn that makes that noise sound and then get back on the loudspeaker and they would make me feel like a criminal you know, like I did something wrong and so I would just do what they said and I would leave the area and go somewhere completely different. I wanted no confrontation. I always follow the law and respect police.

Messina Dep. at 55:3–13. And the same was true of McDonald—who testified that the police would "honk their horn," Trial Tr. at 56:12–13, and tell him that, "if they come back around, they're gonna take [him] to jail if [he is] still around," *id.* at 49:11–13. It's also undisputed that the City has vigorously enforced the Right-of-Way Ordinance. The Plaintiffs submitted nearly 137 pages of citations, notices to appear, and arrest records—many reflecting arrests and detentions for violations of the Right-of-Way Ordinance. *See generally* Solicitation Arrest Forms; *see also* Pls.' Ex. 3 (notices to appear) [ECF No. 113-2]. Of course, "[p]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony List*, 573 U.S. at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

It seems clear to us, in short, that Messina and McDonald would like to seek donations on public rights-of-way more often than they do but have limited their panhandling activities because they fear arrest. And this fear of arrest is, given everything we've said, grounded in a "credible threat of prosecution." *Wilson*, 132 F.3d at 1428. They've thus met their light burden of showing that "they've been chilled from exercising [their] right to free expression or for[went] expression in order to avoid

29

enforcement consequences" under the Hand-to-Hand Transmission Clause. *Ibid.*; *see also Leverett*, 775 F.2d at 1539 (noting that a plaintiff has standing to bring a First Amendment challenge when an "allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his or her affairs").

At the same time, the Plaintiffs have failed to establish their standing to challenge the Panhandling Ordinance.[11] For starters, the Plaintiffs concede that McDonald never had standing to challenge that law. *See* Trial Tr. at 26:20–27:3 ("THE COURT: Do you agree [that Mr. McDonald never engaged in conduct that was regulated by the panhandling ordinance]? MR. TASEFF: Yes."); *see also* Partial Tr. of Jan. 17, 2024, Status Conference ("Jan. 17 Status Conf. Tr.") [ECF No. 122] at 7:23–8:4 ("Our contention from the beginning of the proceeding was that [McDonald] was a roadway solicitor, not a sidewalk solicitor. So, therefore he has no harm or damages . . . and no standing [to challenge the Panhandling Ordinance], because he never engage[d] in that very conduct.").

But the parties "disagree[d]" on this point "with respect to Mr. Messina[.]" Trial Tr. at 27:4– 8. The City argued that the Panhandling Ordinance "was never applied to [Messina], nor did it . . .

---

[11] Because we've already dissolved our injunction against the Panhandling Ordinance, *see* Order Partially Dissolving Preliminary Injunction as to Code § 16-82 [ECF No. 112]—and because the City has repealed the Panhandling Ordinance, *see* Fort Lauderdale, Fla., Ordinance No. C-22-30 (Sept. 6, 2022) (amending § 16-82 to delete language pertaining to panhandling); *see also* Partial Tr. of Jan. 17, 2024, Status Conference ("Jan. 17 Status Conf. Tr.") [ECF No. 122] at 6:19 ("[T]he panhandling provisions of 16-82 have in fact been repealed.")—we needn't revisit whether the Plaintiffs had standing to enforce that injunction in the first instance, *see United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1229 (11th Cir. 2015) (once dissolved, an injunction "no longer has legal effect on the parties, and a decision by this court affirming or vacating the defunct injunction 'cannot affect the rights of [the] litigants'" (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974))). Still, the Plaintiffs' challenge to § 16-82 isn't totally moot because it includes a separate request for damages. *See* Compl. at 12 (requesting "[a]ll damages permitted by law"); *cf. KH Outdoor, L.L.C. v. Clay Cnty.*, 482 F.3d 1299, 1303 (11th Cir. 2007) ("When a plaintiff requests damages, as opposed to only declaratory or injunctive relief, changes to or repeal of the challenged ordinance may not necessarily moot the plaintiff's constitutional challenge to that ordinance." (cleaned up)).

chill [his] First Amendment activity," *id.* at 27:16–18, because "his testimony at the deposition is extremely vague about engaging in that conduct and is even more vague about whether or not he actually altered his behavior in any way because of the panhandling ordinance. . . . There's no record that he maintained as to any day that it allegedly occurred that a police officer said while he was engaged in 16-82 regulated activity to stop doing it," *id.* at 28:2–8. Here, we agree with the City—principally because Messina was clear at his deposition that he *never* engaged in the activities the Panhandling Ordinance proscribed.

To recap, the Panhandling Ordinance prohibited "panhandling at bus stops and public transportation facilities; in public transportation vehicles; at parking lots, parking garages, and parking pay stations owned or operated by the City; in parks owned or operated by the City; within 15 feet of a sidewalk café, automatic teller machine, or an entrance or exit of a commercial or governmental building; and on all private property, unless the property owner has given permission." Compl. ¶ 18 (citing Panhandling Ordinance at 1–2). The Panhandling Ordinance also forbade "'aggressive panhandling'" anywhere in the City. *Id.* ¶ 20 (quoting Panhandling Ordinance at 1). And it defined "'aggressive panhandling, begging or solicitation' . . . to include '[r]equesting money or something else of value after the person solicited has given a negative response to the initial request'" or "blocking a person's passage, touching a person without permission, or engaging in conduct threatening another with 'imminent bodily injury' or 'commission of a criminal act' or intended to force compliance with demands." *Id.* ¶ 19 (quoting Panhandling Ordinance at 1).

We'll take these two provisions in reverse order. The first one's easy: Messina never raised the aggressive-panhandling clause as an issue in his case. He never said that he, at any time, requested money from someone after that person had refused, and he never testified that he ever touched, blocked, or threatened someone who had refused to give him money. *See generally* Messina Dep. Nor did Messina suggest that he *intended* to do any of these things but didn't *because of* the Panhandling

Ordinance. In these circumstances, Messina hasn't established his standing to challenge this second part of the Panhandling Ordinance because he never "had an intention to engage in a course of conduct arguably affected with a constitutional interest[ ] but proscribed by [this part of the Panhandling Ordinance.]" *Pittman*, 267 F.3d at 1283–84.

Messina's testimony about the first part of the Panhandling Ordinance fared no better. He was clear that he'd "never . . . [gone] to private property to ask for donations." Messina Dep. at 52:13–18. And he specifically denied ever "position[ing] [himself] within 15 feet of the action [sic] of a building like a commercial building or a government building." *Id.* at 52:19–24. He also denied soliciting donations (1) in any of "the city parks," *id.* at 52:25–53:2; (2) "within a parking lot or parking garage," *id.* at 53:3–6; (3) "within 15 feet of an outdoor café or restaurant," *id.* at 53:7–11; or (4) "immediately adjacent to a bus stop," *id.* at 53:12–54:13.[12] This last one is important, and we'll come back to it. Messina did (it's true) testify that he would solicit near the "Galleria Mall" because there was a "Starbucks there," so he "would stand on the sidewalk" and "talk to people that were walking down the sidewalk . . . coming in and out of the shopping centers [and to] people going in and out of the Starbucks . . . and ask for help." *Id.* at 38:20–39:1. But, given how unambiguously he denied ever panhandling within 15 feet of a commercial establishment, he must have been more than 15 feet from the Galleria Mall and the Starbucks.[13] Messina has thus failed to establish his standing to challenge the

---

[12] Messina wasn't asked whether he panhandled within 15 feet of an ATM. *See generally* Messina Dep. But, because he "bears the burden of proof" of establishing "each element of standing," *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000) (quoting *Lujan*, 504 U.S. at 561), we cannot infer that he ever did.

[13] On cross-examination, Messina conceded that he didn't "carry a tape measure" and thus couldn't "measure[ ] the front of a building or an actual bus stop," Trial Tr. at 69:10–20, and that he sometimes was "very close" to different buildings, *id.* at 69:24. Again, however, he specifically denied ever soliciting within 15 feet of a commercial establishment, parking lot, park, or restaurant—so "very close" must have been 16 feet or more from these buildings. And his not carrying "a tape measure" doesn't prove anything. Remember that it was Messina's burden to establish his standing. *See Bischoff*, 222 F.3d at 878.

*first* part of the Panhandling Ordinance because he hasn't shown that he "had an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [this part of the Panhandling Ordinance.]" *Pittman*, 267 F.3d at 1283–84.

The Plaintiffs don't really contest most of this. Still, at trial and again at a status conference on January 17, 2024, Plaintiffs' counsel insisted that Messina *might* have standing to challenge the Panhandling Ordinance because he "solicited pedestrians on sidewalks primarily *at* bus stops." Trial Tr. at 130:7–8 (emphasis added).[14] Unfortunately, Messina never said that. As we've explained, the Panhandling Ordinance *did* prohibit solicitation "at" bus stops. *See* Panhandling Ordinance at 1. But, in his deposition, Messina was clear that he never panhandled "*by* the bus stop"—only "*near* the bus stop." Messina Dep. at 53:23–24 (emphasis added). And he said that he *never* panhandled so close to a bus stop that he could "reach out and touch" the bus stop's sign. *Id.* at 54:10–13. He thus never panhandled "at" the bus stop.

"Words are to be understood in their ordinary, everyday meanings[.]" ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012). In prohibiting panhandling "at" a bus stop, the Panhandling Ordinance proscribes panhandling at an "*exact* position or *particular* place." *At*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/at (emphasis added). By contrast, Messina's testimony—that he was merely "near" the bus stop—suggests only that he was "not far away in distance" from the bus stop, *Near*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/near; *see also United States v. Benson*, 917 F. Supp. 543, 550 (W.D. Tenn. 1955) ("The ordinary meaning of near is close to.")—or, as Messina put it, that he was "a stone's throw" away from the bus stop, *see* Messina Dep. at 53:25–54:1. By clarifying

---

[14] *See also* Jan. 17 Status Conf. Tr. at 8:19-22 ("[PLAINTIFFS' COUNSEL]: [Messina] did in fact solicit on sidewalks . . . [i]ncluding near a bus stop.").

that he "wasn't by the bus stop" or even within an arm's length of the bus stop, *id.* at 53:20–54:13, Messina was underscoring that he never panhandled in a way that would've brought his conduct within the ambit of the Panhandling Ordinance, *cf. By*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/by ("[N]ear or at the side of.").[15] Nor did Messina say that he ever *wanted* to panhandle in a way that violated the Panhandling Ordinance. *See generally* Messina Dep. And Plaintiffs' counsel conceded that, if Messina failed to show that he panhandled (or intended to panhandle) "at" bus stops, then this part of the Panhandling Ordinance would have caused him no harm. *See* Jan. 17 Status Conf. Tr. at 14:13-17 ("[PLAINTIFFS' COUNSEL]: The issue as I see it right now in answer to your question is he doesn't get damages if he never crossed that line, so to speak, so if there's evidence to show that he's outside that line, then he never received -- he wasn't harmed."). Messina has, in short, failed to establish his standing to

---

[15] In giving effect to these subtle differences in Messina's testimony, we don't mean to suggest that Messina had to "carry a tape measure[.]" Messina Dep. at 10:12. We're simply showing that "a material variation in terms suggests a material variation in meaning." SCALIA & GARNER at 167. Messina was clear that he was never "by" the bus stop—which is sufficient for us to find that he was never "at" the bus stop, as the Panhandling Ordinance required. Consider the following illustration:

> Imagine you are in a rainstorm, ten feet from an overhanging ledge. Move one foot toward it; you still get wet. Move over another foot; you still get wet. Keep moving, and at some point you no longer get wet. Continue to move another foot in the same direction; you don't get any drier. So nature has set up a discontinuity between the segment of the path where gradual changes of position leave you equally wet and the segment where gradual changes leave you equally dry. And it is exactly at that discontinuity that one would begin to describe your position using *under* rather than *near*.

STEVEN PINKER, THE STUFF OF THOUGHT: LANGUAGE AS A WINDOW INTO HUMAN NATURE 186 (2007) (first emphasis added). Just as there's a point at which the pedestrian goes from being "near" the ledge to being "under" it, there's a point at which a panhandler goes from being "near" the bus stop to being "by" (or even "at") it. Messina emphasized that he *never* reached these last two points by specifying that he only ever remained "near the bus stop." Messina Dep. at 53:23–24. And he never suggested that, but for the Panhandling Ordinance, he would've come closer to the bus stop. We see no reason not to take him at his word. *See Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 2018 WL 11352032, at *2 (S.D. Fla. Aug. 8, 2018) (Moore, C.J.) ("As fact-finder, it was well within the purview of the Court's authority to apportion weight and determine credibility as it saw fit." (citing *Reed v. Mitchem*, 707 F. App'x 617, 619 (11th Cir. 2017))).

challenge the Panhandling Ordinance. *See Pittman*, 267 F.3d at 1283–84.

Federal courts have an "independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). And the Plaintiffs bear the burden "of proving standing . . . 'by the evidence adduced at trial.'" *Common Cause v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561). Both Plaintiffs failed to meet this burden as to the Panhandling Ordinance. We therefore agree with the City that the Plaintiffs lack standing to challenge the Panhandling Ordinance because there "wasn't sufficient evidence in this record to show that Bernard McDonald or Mark Messina's rights were violated by the existence of [this] regulation." Trial Tr. at 138:2–5.

## II.   THE MERITS

The Hand-to-Hand Transmission Clause violates the First Amendment. As we've said, the parties agree that the Hand-to-Hand Transmission Clause—essentially, a time, place, and manner restriction on hand-to-hand exchanges along certain City roads—is "content neutral and subject to intermediate scrutiny." *Messina*, 546 F. Supp. 3d at 1249; *see also* Trial Tr. at 21:5–6 ("The problem the City has is at the core of their failure to show that the law is actually narrowly tailored[.]"); *id.* at 35:7–8 ("What we [the City] say with respect to this is that it is, as far as hand-to-hand transmissions go, it is content neutral. Anything is - - anything and everything is covered. No content of any expressive activity[.]").

### A.   THE LAW

We'll uphold the law, therefore, only if it's "narrowly tailored to achieve a significant government interest and leaves open alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45; *see also Bloedorn*, 631 F.3d at 1231 ("Thus, a time, place, and manner restriction can be placed on a traditional public forum only if it is content neutral, narrowly tailored to achieve a significant

government interest, and leaves open ample alternative channels of communication." (cleaned up)). And the burden of establishing the law's constitutionality lies firmly with the City. *See NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1227 (11th Cir. 2022) ("When a law is subject to intermediate scrutiny, *the government* must show that it is narrowly drawn to further a substantial governmental interest unrelated to the suppression of free speech." (emphasis added)).

To satisfy narrow tailoring, the Hand-to-Hand Transmission Clause must "promote a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). The Clause, in other words, can *neither* "burden substantially more speech than is necessary to further the government's legitimate interests" *nor* "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance [the government's] goals." *Ibid.* (cleaned up)); *see also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1295 (11th Cir. 2021) ("Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve the government's interest." (cleaned up)).

**B.   ANALYSIS**

The Plaintiffs don't challenge the City's stated "interest in two things," Trial Tr. at 32:11: (1) "the traffic safety of motorists and pedestrians," *id.* at 32:12–13; and (2) the "efficient movement of vehicles on the city streets and roadways," *id.* at 32:13–15. Nor could they. *See McCullen*, 573 U.S. at 486 ("We have, moreover, previously recognized the legitimacy of the government's interests in ensuring public safety and order [and] promoting the free flow of traffic on streets and sidewalks[.]" (cleaned up)).

But that's not the end of our inquiry. "That the Government's asserted interests are important

36

in the abstract does not mean, however, that the . . . rule will in fact advance those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality op.) ("*Turner I*") (cleaned up). Indeed, "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Ibid.* (cleaned up); *see also Wollschlaeger*, 848 F.3d at 1293 (reiterating this proposition); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden[.]"). And (notably) it's the Court's "obligation . . . to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences *based on substantial evidence.*" *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) ("*Turner II*") (emphasis added & cleaned up); *see also Turner I*, 512 U.S. at 666 ("[W]e have stressed in First Amendment cases that the deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'" (quoting *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 129 (1989)).

The Eleventh Circuit, in fact, made this point rather forcefully in *Buehrle v. City of Key West*, 813 F.3d 973 (11th Cir. 2015). As it explained there:

> We do not simply take the City at its word that the ordinance serves the aforementioned interests. Instead, the City must demonstrate that it had *a reasonable basis* for believing that its regulation would further these legitimate interests. This burden is not a rigorous one. *But a municipality cannot get away with shoddy data or reasoning.* It must rely on *at least some pre-enactment evidence* that the regulation would serve its asserted interests. Such evidence can include anything reasonably believed to be relevant—including a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion.

*Id.* at 978–79 (emphases added & cleaned up). In *Buehrle*, the court held that the City of Key West had "presented insufficient evidence that it had a reasonable basis for believing that its ordinance [restricting the operation of tattoo parlors] would actually serve the significant governmental interests it propounds." *Id.* at 980. This "reasonable basis" standard indicates that it isn't enough, when a law

impinges on the freedom of speech, for the government simply to assure us that the law will further some significant interest. The decision suggests, rather, that the government must come forward with some *objective* evidence in support of its ordinance. And this insistence on *objective* data when First Amendment rights are at stake reflects the tests we've developed for other free-speech contexts. "Restrictions on commercial speech," for example, "must not only address a valid problem, but must also contribute effectively to the solution[.]" *Sciarrino v. City of Key West*, 83 F.3d 364, 368 (11th Cir. 1996). The focus there "is on whether the evidence supports the idea that the regulation will actually work." *Ibid.* (citing *Edenfield v. Fane*, 507 U.S. 761, 769 (1993)). And notably: "The party defending the regulation," the Supreme Court has said, "must present some *concrete* indications that the regulation will have the intended effect." *Ibid.* (emphasis added & cleaned up).

In either event, *Buehrle* was really echoing a sentiment Justice Souter had expressed fifteen years earlier (in a part of a concurring opinion none of his colleagues appeared to challenge):

> The upshot . . . is that intermediate scrutiny requires a regulating government to make some demonstration of an evidentiary basis for the harm it claims to flow from the expressive activity, and for the alleviation expected from the restriction imposed. That evidentiary basis may be borrowed from the records made by other governments if the experience elsewhere is germane to the measure under consideration and actually relied upon. I will assume, further, that the reliance may be shown by legislative invocation of a judicial opinion that accepted an evidentiary foundation as sufficient for a similar regulation. *What is clear is that the evidence of reliance must be a matter of demonstrated fact, not speculative supposition.*

*City of Erie v. Pap's A.M.*, 529 U.S. 277, 311 (2000) (Souter, J., concurring) (emphasis added & cleaned up).

On this point, Judge Rosenbaum's decision in *Cosac* is instructive. The city there enacted a "Right-of-Way Solicitors and Canvasser's Ordinance" that's virtually identical to our Hand-to-Hand Transmission Clause. *See Cosac*, 2013 WL 5345817, at *1 ("For the purpose of this section, 'right-of-way canvasser or solicitor' shall mean any person who sells or offers for sale any thing or service of any kind, or who seeks any donation of any kind, or who personally hands or seeks to transmit by

hand or receive by hand any thing or service of any kind, whether or not payment in exchange is required or requested, to any person who operates or occupies a motor vehicle of any kind, which vehicle is engaged in travel on or within any portion of any of the streets or roadways in the City, whether or not such vehicle is temporarily stopped in travel lanes of the road."). And (as here) the plaintiff in *Cosac*—a "nonprofit, tax-exempt corporation that produces . . . a street newspaper that seeks to educate citizens about issues of homelessness and poverty," *ibid.*—challenged the ordinance on First Amendment grounds, arguing that "it cannot be upheld as a reasonable time, place, or manner regulation of protected speech," *id.* at *9.

Judge Rosenbaum began by analyzing the ordinance and evaluating—in great detail—the pre-enactment evidence the city had relied on. *See id.* at *2–5 (setting out the ordinance's preamble and the steps taken by the "City's Planning and Zoning Board to study the issue of street vendors"). One such piece of evidence was a "local newspaper article published in 2003," which showed that "29 right-of-way canvassers/solicitors have been seriously injured and at least 14 more have been killed by motor vehicles during a 15-year period; [with] many of those deaths occur[ing] while the canvasser/solicitor was sitting or standing in a median or on the side of the street[.]" *Id.* at *3 (cleaned up). There was also a study on "the issue of street vendors," which included, among other things, "[a] review of documentation which revealed that 43 right-of-way canvassers had been seriously injured or killed, many while sitting or standing on a median or close to the roadway, including three (3) South Florida Newspaper vendors." *Ibid.*

Based on this evidence, Judge Rosenbaum concluded that the city's ordinance was narrowly tailored to achieve a significant governmental interest. As she explained:

> By these measures, the Ordinance is narrowly tailored to serve the City's significant interests in traffic control and citizen safety. It regulates only canvassing and soliciting, and it does so with regard to only six of the City's roadways, or less than 10% of the City's public roads. Significantly, only after City staff analyzed each of the major roads within its jurisdiction did the City identify the six streets where canvassers could pose a particularly increased danger on traffic flow, driver safety and safety of the canvasser

. . . . The City made what the Court finds was a reasoned determination that canvassing and soliciting on these few roadways creates a significant risk of traffic flow problems and accidents. "Without second-guessing that judgment, which lies well within the City's discretion," the Court cannot conclude that banning canvassing and soliciting on the six roadways burdens "substantially more speech than is necessary to further the government's legitimate interest."

*Id.* at *19 (quoting *Smith*, 177 F.3d at 956–57).

The pre-enactment evidence our City relies on bears almost no resemblance to the detailed, canvasser-based data Judge Rosenbaum reviewed in *Cosac*. Our City—unlike the municipality there—has produced *no evidence* of canvasser- or solicitor-related deaths, accidents, or injuries *over any time period*. To hide this reality, it's offered up lots of irrelevant data about things like "distracted driving," *see* Feldman Memo at 2 ("In 2011, 165 drivers in the State of Florida were involved in fatal crashes due to distracted driving. Between 2011 and 2013, almost 10 percent of all crashes in the City of Fort Lauderdale were attributed to distracted driving as reported by law enforcement agencies."); [16] "pedestrian fatalities," *id.* at 1 ("During that period [2011–12], a total of approximately 3,275 crashes occurred at these intersections. A closer examination of pedestrian fatalities within the City revealed that between 2011 and 2013, there is a total of 24 pedestrian fatalities."); [17] statewide traffic-accident figures, *see* Street Solicitation Memo at 13 (showing that, in 2012, "Florida had the third highest number of total [traffic-related] fatalities behind Texas and California"); and Citywide traffic-congestion levels, *see id.* at 15–16 (noting that traffic congestion—as measured by the AADT and LOS—was high throughout the City's arterial roads). As we've explained, none of this data—the number of people killed and injured across the country due to distracted driving, the number of pedestrian fatalities in a given year, the number of accidents in Florida vis-à-vis other states, or the

---

[16] *See also* Street Solicitation Memo at 14 (noting that "5,474 people were killed and another 448,000 were injured across the U.S. due to distracted driving").
[17] *See also* Street Solicitation Memo at 13 (citing an unattached FHA study for the proposition that the City had "a pedestrian fatality rate that is above the national average").

degree of congestion on the City's roads—identifies *street solicitation* as a potential cause of any of these problems.

The City, in fact, has *conceded*—at almost every point in this lawsuit—that it can point to no single instance of a person who was engaged in roadway solicitation causing or contributing to (or being injured by) a motor vehicle accident. It admitted it in discovery. *See* Pls.' Ex. 5 ("Defendant City's Amended Response to Plaintiffs' First Request for Admissions") [ECF No. 113-4] ¶ 6 ("Although the data presented to the City Commission at the time Ordinance C-14-38 was adopted included pedestrian injuries during the two year period preceding the adoption of the ordinance, the data does not specify whether the pedestrians were acting as right-of-way canvassers or solicitors at the time of the accident or injury. The accident reports for the two year period preceding the adoption of Ordinance C-14-38 are no longer in possession of the City, and as a result, the City is unable to ascertain whether the accident report indicated the nature of the activity the pedestrian was engaged in at the time of the accident or injury."). It conceded this point at summary judgment. *See* PSOMF ¶ 7 ("The City cannot cite a single accident or incident for the two-year period prior to the passage of City Ordinance § 25-267 of a pedestrian injury of a person who was engaged in roadway solicitation." (citing Defendant City's Amended Response to Plaintiffs' First Request for Admissions ¶ 6)); *see also* DSOMF ¶ 7 ("Not disputed."); PSOMF ¶ 8 ("The City cannot cite a single accident or incident for the two-year period prior to the passage of City Ordinance § 25-267 where a person who was engaged in roadway solicitation caused or contributed to a motor vehicle accident." (citing Defendant City's Amended Response to Plaintiffs' First Request for Admissions ¶ 8)); DSOMF ¶ 8 ("Not disputed.")). And it admitted this again at trial:

> THE COURT: I think the biggest - - and I reviewed that evidence in detail at the summary judgment phase and actually spent a great deal of time with it. And I guess one issue that I have with it, which we'll talk about, is the extent to which any of it has anything to do with panhandlers. And I just was at a loss to find . . . specific instances of panhandlers engaging in conduct that led to accidents. And I guess . . . that's a question that

> will be addressed during the course of the trial[.]

> MR. BURKE: So I would agree with the Court that it does not have any statistics from that which was reviewed as to whether or not a pedestrian accident involved a solicitor. Or whether or not it involved a driver who was distracted by the actions of a solicitor either in striking a motor vehicle or a pedestrian.

Trial Tr. at 29:12–20.

So far as we can tell, only one federal circuit court of appeals has ever addressed, in this context, so striking an incongruity between the opinions of a city employee and the data that employee relied on. *See Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021). And that court did precisely as we do here: It held that the city had failed to meet its burden of establishing, with competent evidence, that its panhandling ordinance was narrowly tailored to achieve a significant government interest. *See id.* at 1227–28 ("In light of the paucity of evidence proffered by the City showing that the harms or the remedial effects of the [o]rdinance are supported by more than speculation and conjecture, the [o]rdinance's breadth merely reinforces our ultimate conclusion that the [o]rdinance burdens substantially more speech than is necessary to further the City's legitimate interests and is, therefore, not narrowly tailored.").

In that case, a group of panhandlers challenged an ordinance that, among other things, prohibited "engaging in any kind of exchange with occupants of a vehicle in a travel lane." *Id.* at 1209. The district court had awarded summary judgment "in substantial part" to the panhandlers, who'd "contended that, while the [c]ity maintained that it enacted the ordinance to address safety concerns, it collected no empirical data about accidents involving pedestrians nor, more specifically, compiled any data describing injuries or fatalities involving pedestrians . . . interacting with vehicle occupants." *Id.* at 1213–14. On appeal, the city challenged the district court's determination "on the narrow tailoring prong of [the court's] multi-pronged First Amendment analysis, contesting not only the type and quantum of evidence our case law demands to establish narrow tailoring, but also whether the

42

[c]ity was required to try, or at least consider, alternate, equally-effective restrictions that burden less speech before settling on the [o]rdinance." *Id.* at 1218.

The Tenth Circuit affirmed. "[T]he evidence that the [c]ity relies on," the court said, "does not indicate that the [o]rdinance alleviates in a direct and material way a real, non-speculative harm[.]" *Id.* at 1222. As a result, the court concluded, "the [c]ity is unable to establish that the [o]rdinance does not burden substantially more speech than necessary to further its interest in pedestrian safety." *Ibid.* In words that apply with equal force here, the Tenth Circuit explained how the city's evidence had fallen short. The city, the court said, "relies on three categories of evidence to argue that the [o]rdinance materially alleviates significant traffic safety problems in Albuquerque: [1] the opinions of Melissa Lozoya, P.E., a 'registered Professional Civil Engineer' and Deputy Director of the City's Department of Municipal Development . . . [;] [2] a series of accident reports discussing . . . collisions resulting from physical interactions between pedestrians and motorists in travel lanes[;] and [3] general statistical information, primarily compiled in the [o]rdinance's preamble, along with anecdotes from city councilors, police officers, and constituents." *Id.* at 1227 (cleaned up). The court found this evidence, even taken together, insufficient.

Starting with "Ms. Lozoya's opinions," which the court called "theoretical," the panel noted that they were "largely unmoored from any on-the-ground data regarding Albuquerque's traffic safety problems." *Id.* at 1229. Turning to "the accident reports," the court agreed with the district court that they "actually *rebut* any inference of narrow tailoring" because "only approximately 6% (25 of 401) of the accident reports related to behaviors specific to the median, ramp, and physical interaction restrictions in the [o]rdinance[.]" *Id.* at 1233. Finally, the court explained that the city's "statistics and anecdotes are simply too generic or isolated" to justify the ordinance because, "on their face, [they] do not specify how many . . . injuries or deaths—if any—were related to . . . exchanges between pedestrians and vehicle occupants in Albuquerque." *Id.* at 1235; *see also id.* at 1237 ("[I]n many respects

the situations described by the anecdotes are largely divorced from the central thrust of the [o]rdinance—which is to ameliorate the purported harms caused by . . . pedestrian involvement in physical exchanges with vehicle occupants.").

Our City's evidence suffers from precisely these three flaws. *First*, Awwad's opinions (like Lozoya's) are "unmoored" from the underlying data. As we've shown, none of the underlying data Awwad relied on has anything to do with street solicitors or canvassers, *see ante* at 14–17—and (as we've highlighted) the City admits as much. *Second*, our City's evidence is even less persuasive than the challenged proof in *Brewer* because, while the city there had at least tracked *some* of its accidents to the presence of street solicitors (about 6%), our City hasn't tracked *any* of its accidents or fatalities to street solicitors. *Third*, the statistics our City relies on are, as in *Brewer*, "too generic and isolated" to justify the Hand-to-Hand Transmission Clause's restriction on First Amendment rights. Again, that data tells us nothing about whether street solicitors generally—or hand-to-hand exchanges specifically—had *anything* to do with the City's traffic and accident problems. The data the City offers never tied *any* of the City's traffic problems to street solicitors or canvassers; it never suggested that street solicitors or canvassers contributed to *any* of the City's various pedestrian fatalities; and it never blamed street solicitors or canvassers for *any* of the City's many traffic accidents.

Now, this case is hard in part because, in her reports, Awwad *did* make these connections. *See, e.g.*, Street Solicitation Memo at 15 ("Additionally, street solicitation increases traffic congestion."). But, again, Awwad didn't base her opinions on *any* of the available evidence. As far as we can tell, in fact, she just made up her conclusions from data that had *nothing* to do with street canvassers or solicitors. And, since the City hasn't offered her up as an expert witness, her opinions—as a *lay* witness—must be "rationally based on [her own] perception[.]" FED. R. EVID. 701. Because they aren't—*i.e.*, because her opinions are totally "unmoored" from the underlying data, *Brewer*, 18 F.4th at 1229—she couldn't offer those opinions at trial, *see Lebron v. Sec'y of Fla. Dep't of Child. & Families*, 772

F.3d 1352, 1372 (11th Cir. 2014) ("The district court did not abuse its discretion in rejecting the testimony of the state's lay witnesses. To be admissible, lay testimony must be (1) 'rationally based on the witness's perception,' (2) 'helpful to clearly understanding the witness's testimony or to determining a fact in issue,' and (3) 'not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" (quoting FED. R. EVID. 701)). And (notably) she didn't offer any such opinions at trial. She, in fact, *never testified at all*.

Even if Awwad *had been* properly designated as an expert—and even if she *had* testified at trial—we likely would've excluded her conclusory (and unsupported) opinions anyway. *See S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1245 (11th Cir. 2009) (affirming the exclusion of an expert report that was "so pervaded by conclusory statements as to be almost without value and that . . . was connected to the data only by [the expert's] *ipse dixit* assertion"). There is, therefore, no scenario in which Awwad could've offered at trial the opinions she included in her Street Solicitation and Traffic memos. And, again, she *didn't* offer those opinions at trial—not because we excluded them, but because the City elected not to call her.

So, at trial, the City did all it could do. It introduced the data (and maps) it relied on when it promulgated the Hand-to-Hand Transmission Clause. The Plaintiffs pointed out (correctly) that the City's evidence proved nothing. And, since we didn't have Awwad's opinions to link that data to the City's admittedly significant interest in traffic safety, we now find that the City has failed to meet its burden of showing that the Hand-to-Hand Transmission Clause furthers that significant interest.

It's no response for the City to implore us to *blindly* defer to its legislative findings simply because "[t]hese legislators have arrived at this decision based on a reasonable approach to it." Trial Tr. at 134:14–17. In *Cosac*, it's true, Judge Rosenbaum said that, "[w]ithout second-guessing" the City's "'judgment, which lies well within the City's discretion, the Court cannot conclude that banning canvassing and soliciting on the six roadways burdens substantially more speech than is necessary to

further the government's legitimate interest.'" *Cosac*, 2013 WL 5345817, at *20 (quoting *Smith*, 177 F.3d at 956–57). But, as we've seen, *Cosac undermines* the City's position because, in that case, Judge Rosenbaum undertook a rigorous analysis of the pre-enactment *evidence* the city *had* considered. What the City is really saying here is that we should defer to its employee's *opinions* about the extent to which street solicitors are dangerous, *even if* those opinions are totally "divorced from" the evidence the employee purported to rely on. *Brewer*, 18 F.4th at 1237. In the City's view, in other words, a municipality can pass any "time, place, and manner" restriction on the free-speech rights of its citizens so long as one of its employees stands up at a commission meeting and attests, in the most general and conclusory way, that the restriction would further a significant governmental interest—in traffic, safety, or whatever else. And that should be true, the City seems to believe, even if the employee's general blandishments are, as here, entirely unsupported by the relevant evidence.

But that's precisely the proposition the Tenth Circuit rejected in *Brewer*—and it's a proposition that's hard to square with the Supreme Court's admonition that "[d]eference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978). Indeed, as the Supreme Court has explained, "whatever deference is due legislative findings would not foreclose our independent judgment of the facts bearing on an issue of constitutional law[.]" *Sable*, 492 U.S. at 129; *cf. Comcast Cablevision of Broward Cnty., Inc. v. Broward Cnty., Fla.*, 124 F. Supp. 2d 685, 697 (S.D. Fla. 2000) (Middlebrooks, J.) ("While a legislative body is entitled to substantial deference, in First Amendment cases the deference afforded to legislative findings does not foreclose independent judgment of the facts bearing on an issue of constitutional law."). The City's data just doesn't support the actions it undertook here: "It relied upon no expert testimony, findings made by other municipalities, or evidence described in judicial decisions," *Buehrle*, 813 F.3d at 980, and "we are not at liberty to simply presume the evidence needed to sustain the ordinance" because "[t]he First Amendment requires more." *Ibid.* (cleaned up).

Without any evidence that street solicitors *cause* accidents—or that hand-to-hand exchanges are in any way dangerous—we're right back where we were when we issued our Preliminary Injunction Order: assessing the constitutionality of a clause that "penalizes panhandlers whose conduct is not dangerous[.]" *Messina*, 546 F. Supp. 3d at 1250. That's because, aside from Awwad's untethered assertions, the City has *still* given us no evidentiary basis to believe that "a person lawfully standing on the sidewalk who accepts a donation from a motorist who is stopped at a light in the lane next to the sidewalk [is any more dangerous] than a person standing on the sidewalk who is holding a sign[.]" *Id.* at 31. Since the City has already conceded that it cannot lawfully proscribe the latter, *see* MSJ Response at 2 (conceding the unconstitutionality of the "Sign" provision, § 25-267(d)), it cannot—at least on this record—penalize the former.

What's worse, as we said back then, the Hand-to-Hand Transmission Clause remains "both over- and under-inclusive: over-inclusive because it penalizes panhandlers whose conduct is not dangerous; under-inclusive because it punishes only the panhandler and not the driver." *Messina*, 546 F. Supp. 3d at 1250.[18] We're thus left with an ordinance that, on the one hand, appears to further no government interest at all and which, on the other, broadly impinges on "the essence of First Amendment expression." *McCullen*, 573 U.S. at 488–89.

We therefore agree with the Plaintiffs that the Hand-to-Hand Transmission Clause "burdens substantially more speech than is necessary to further the government's legitimate interests." *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1295. And that's sufficient for us to find that the law is

---

[18] The Clause is actually under-inclusive in another way—one we hadn't considered before: It doesn't ban *other* sorts of conduct that may be just as dangerous as hand-to-hand transmissions. It doesn't, for instance, ban lost tourists from standing in the street and asking drivers for directions; it doesn't punish angry political activists who yell and blow horns at oncoming traffic; it doesn't even prohibit a person from standing on the swale and waving controversial signs or flags at drivers as they pass. All these are examples of conduct that seem much more likely to lead to distracted driving, accidents, and (sadly) fatalities. All of which underscores our central point—that the City has *no evidence* that its ban will actually reduce accidents or increase traffic flow.

unconstitutional. *See, e.g.*, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 115–16 (2d Cir. 2017) (holding that Oyster Bay's "Solicitation from Streets and Sidewalks Prohibited" ordinance was "not narrowly drawn" because it did "not require any connection between the prohibited speech—solicitation of employment—and the asserted interest—traffic and pedestrian safety. There are numerous ways in which an individual, adjacent to any public right-of-way, might attempt to stop a motor vehicle utilizing said public right-of-way for the purpose of soliciting employment that would cause no threat whatever to public safety." (cleaned up)); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 941 (9th Cir. 2011) (declaring unconstitutional an ordinance that made it unlawful "for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle" because "[t]he [p]laintiffs have identified several obvious examples of prohibited speech that do not cause the types of problems that motivated the [o]rdinance . . . . The [o]rdinance technically applies to children selling lemonade on the sidewalk in front of their home, as well as to Girl Scouts selling cookies on the sidewalk outside of their school and would prohibit signbearers on sidewalks seeking patronage or offering handbills even though their conduct does not pose a traffic hazard" (cleaned up)).

We likewise reject the City's reliance on *Smith*. *See, e.g.*, Trial Tr. at 134:4–13 (City's counsel arguing "that [the Hand-to-Hand-Transmission Clause] is a reasonable time, place, manner restriction, as was analyzed by the Eleventh Circuit in the *Smith* case."). In that case, the court upheld a city ordinance that prohibited "soliciting, begging or panhandling" along a "five-mile strip of beach, a new, one-and-a-half mile promenade sidewalk . . . and the commercial-area sidewalk on the opposite side of Highway A1A"—a spot the parties agreed was "an essential part of the Fort Lauderdale tourism experience . . . [and] a high priority in the City's plan to expand the economic base of the community." *Smith*, 177 F.3d at 955. The court held that the ordinance was "narrowly tailored to serve the City's

interest in providing a safe, pleasant environment and eliminating nuisance activity on the beach," *id.* at 956, explaining that the restriction's "suppression of begging . . . is materially mitigated by the allowance of begging in streets, on sidewalks, and in many other public fora throughout the City," *id.* at 956–57. Our case, of course, is different. The ordinance there applied only to a discrete portion of a newly-refurbished beachfront—a beachfront that, *both sides stipulated*, was an essential ingredient in the city's "plan to expand the economic base of the community." *Id.* at 955. And the court upheld the ban in large part because it otherwise *allowed* for panhandling on streets and sidewalks throughout the city. In this way, the ordinance was, as it were, quite narrowly tailored. But our ordinance does precisely the opposite: It doesn't constrain itself to a prized, mile-long stretch of beachfront, and it proscribes, to a significant degree, panhandling on many of the City's busiest streets and sidewalks. *See* Peak Level of Service Map; *see also ante* at 5 n.3 (explaining that the Right-of-Way Ordinance, by incorporating § 25-97 of the City Code, applies to sidewalks too).

There is, it's true, one sentence in *Smith* that gives us pause. In discussing the issue we face here—*viz.*, whether the law was narrowly tailored to further a significant government interest—the Eleventh Circuit said this: "The city has made the discretionary determination that begging in this designated, limited beach area adversely impacts tourism. Without second-guessing that judgment, which lies well within the City's discretion, we cannot conclude that banning begging in this limited beach area burdens substantially more speech than is necessary to further the government's legitimate interest." *Smith*, 177 F.3d at 956 (cleaned up). But, for two reasons, we don't take this sentence to mean that, in the context of municipal ordinances that restrict First Amendment rights, we must defer (without engaging in any meaningful review of the available evidence) to the City's legislative findings.

*One*, if the City's reading of *Smith* is right, then a municipality would *never* have to produce evidence for its view that an ordinance is narrowly tailored to further a significant governmental interest. Instead, we in the Judiciary would always just *defer* to the city's legislative determination on

this crucial issue. But that would flout what both the Supreme Court and the Eleventh Circuit have repeatedly said about this inquiry, which is that "[d]eference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc.*, 435 U.S. at 843; *see also Nixon*, 528 U.S. at 392 ("We have never accepted mere conjecture as adequate to carry a First Amendment burden[.]"); *Turner I*, 512 U.S. at 664 ("That the Government's asserted interests are important in the abstract does not mean, however, that the . . . rule will in fact advance those interests." (cleaned up)); *ibid.* ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." (cleaned up)); *id.* at 666 ("[W]e have stressed in First Amendment cases that the deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'" (quoting *Sable*, 492 U.S. at 129)); *Turner II*, 520 U.S. at 195 (noting that it's the Judiciary's "obligation . . . to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." (cleaned up)); *Buehrle*, 813 F.3d at 979 ("We do not simply take the City at its word that the ordinance serves the aforementioned interests. Instead, the City must demonstrate that it had a reasonable basis for believing that its regulation would further these legitimate interests. This burden is not a rigorous one. But a municipality cannot get away with shoddy data or reasoning. It must rely on at least some pre-enactment evidence that the regulation would serve its asserted interests." (cleaned up)); *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999) (upholding a zoning restriction and explaining that "*ample evidence*, from Jacksonville and elsewhere, supports the district court's finding that illegal and unhealthy activities take place in

small rooms at adult entertainment establishments" (emphasis added & cleaned up)).[19]

Given this ample support for the Plaintiffs' view that the Judiciary has an important role to play in evaluating a city's pre-enactment evidence, it's unsurprising that the Tenth Circuit adopted this same approach in *Brewer*:

> The City's efforts to show narrow tailoring, however, are unavailing. We summarize our reasons as follows. Fundamentally, the fit between the 'means' chosen by the City—subsections (B) through (E) of the Ordinance—and its 'ends'—reducing pedestrian-vehicle conflicts and otherwise keeping pedestrians safe—is impermissibly poor because, as the record evidence reflects, the Ordinance neither alleviates any real, non-speculative harms in a direct and material (i.e., effective) way, nor otherwise advances the City's more abstract safety rationales. More specifically, the fact that the Ordinance burdens substantially more speech than necessary to achieve the City's interest in pedestrian safety is unmistakable when the Ordinance's expansive restrictions on speech and expressive conduct are juxtaposed against the paltry record evidence of real, non-speculative harms ameliorated by the Ordinance.

18 F.4th at 1226. And this, of course, is the approach district courts in our Circuit have routinely taken—even after *Smith*. *See Cosac*, 2013 WL 5345817, at *17 ("In the context of a First Amendment challenge, '[w]hen the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'" (quoting *Turner I*, 512 U.S. at 654)); *see also Comcast Cablevision of Broward Cnty.*, 124 F. Supp. 2d at 697 ("When the government defends a regulation on speech it must demonstrate that the harm it seeks to prevent is real, not merely

---

[19] *Cf. City of Erie*, 529 U.S. at 311 (Souter, J., concurring) ("The upshot . . . is that intermediate scrutiny requires a regulating government to make some demonstration of an evidentiary basis for the harm it claims to flow from the expressive activity, and for the alleviation expected from the restriction imposed. That evidentiary basis may be borrowed from the records made by other governments if the experience elsewhere is germane to the measure under consideration and actually relied upon. I will assume, further, that the reliance may be shown by legislative invocation of a judicial opinion that accepted an evidentiary foundation as sufficient for a similar regulation. What is clear is that the evidence of reliance must be a matter of demonstrated fact, not speculative supposition." (cleaned up)).

conjectural, and that the regulation will alleviate the harm in a direct and material way. A court may not simply assume that an ordinance will advance the asserted state interests sufficiently to justify its abridgment of expressive activity." (cleaned up)). The City might be right, in other words, that the Eleventh Circuit intended—in this one relatively obscure sentence from *Smith*—to do away with the evidence-based inquiry federal courts, including the Supreme Court, have been applying in this context for decades. But, given everything we've said, we think that's highly unlikely.

*Two*, the central proposition in *Smith*—that begging on a refurbished beachfront diminished the "pleasant environment" the city was going for—was *both* obvious *and* difficult to calculate. It was obvious because few people would deny that there's something inherently *unpleasant* about being panhandled to on a beachside stroll. And it was difficult to calculate because there's no easy way of computing the degree to which beachside strollers find this kind of interaction unpleasant. The City's proposition here, by contrast, is at once less obvious and much easier to prove. It's less obvious because, as we've seen from the Plaintiffs' evidence, a man can safely engage in hand-to-hand transactions with vehicles that are stopped at a light. *See* Trial Tr. at 64:19–23 ("Q. The medians are a really important place to seek donations from[?] A. Yeah, they're safe. Q. Okay. Safer than the sidewalk and off the road then[?] A. Yes, they are. For me."). And it's easier to compute because, as Judge Rosenbaum explained in *Cosac* (and as the Tenth Circuit confirmed in *Brewer*), cities can easily track the annual number of accidents, injuries, and fatalities that involve street solicitors. *See Cosac*, 2013 WL 5345817, at *18 ("The City asserts that it acted on . . . news reports on fatal and non-fatal *accidents involving right-of-way canvassers* nationwide, which revealed three such accidents that occurred in South Florida and involved roadway newspaper vendors." (emphasis added)); *id.* at *3 (quoting a "local newspaper article published in 2003," which showed that "29 right-of-way canvassers/solicitors have been seriously injured and at least 14 more of have been killed by motor vehicles during a 15-year period; [with] many of those deaths occur[ing] while the canvasser/solicitor was sitting or standing in

a median or on the side of the street"); *ibid.* (noting a study on "the issue of street vendors," which included, among other things, "[a] review of documentation which revealed that 43 right-of-way canvassers had been seriously injured or killed, many while sitting or standing on a median or close to the roadway, including three (3) South Florida Newspaper vendors"); *Brewer*, 18 F.4th at 1233 ("Thus, only approximately 6% (25 of 401) of the accident reports related to behavior specific to the median, ramp, and physical interaction restrictions in the Ordinance—or, stated differently, nearly 94% (376 of 401) of the relevant reports involved either lawful behaviors or behaviors that the Ordinance's median restrictions, ramp restrictions, and physical-exchange restrictions do not address." (cleaned up)). Our City just didn't do that work here.

Which brings us to our final point: The City hasn't shown—as it needed to—"that it seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 494. In *McCullen*, the Court struck down a law that criminalized standing within 35 feet of places where abortions are performed because the state—while it "tried other laws already on the books"— had identified "not a single prosecution or injunction against individuals outside abortion clinics [under those pre-existing laws] since the 1990s." *Ibid.* "Given the vital First Amendment interests at stake," the Court said, "it is not enough for Massachusetts simply to say that other approaches have not worked." *Id.* at 496. But our City doesn't even tell us what other less intrusive efforts it undertook that eventually proved inadequate. When First Amendment freedoms are at stake, the Supreme Court has been clear, the City's say-so just won't do.

We therefore hold that the Hand-to-Hand Transmission Clause is *not* "narrowly tailored to achieve a significant government interest[.]"[20] *Perry Educ. Ass'n.* 460 U.S. at 45. It's therefore

---

[20] Remember that the City must satisfy *both* elements—narrow tailoring *and* alternative channels. Since we've found that the City has failed to produce sufficient evidence on the first element, we needn't address the second. *See McCullen*, 573 U.S. at 496 n.9 ("Because we find that the Act is not narrowly

unconstitutional—both on its face and as applied to the Plaintiffs.[21]

### C.   RELIEF

As redress, the Plaintiffs "seek the following relief: A. A declaration that . . . 25-267 of the City Code violate[s] the First Amendment of the U.S. Constitution facially and as applied to Plaintiffs; B. A preliminary and permanent injunction prohibiting the City from enforcing Section . . . 25-267 of the City Code; C. All damages permitted by law; D. Attorneys' fees and costs; and E. Any other relief that is just and proper." Compl. at 11–12. We'll start with prospective relief.

### 1.   Prospective relief

As we've said, Messina's estate cannot satisfy the elements of a permanent injunction because (given his passing) he's not likely to be affected by the City's enforcement of the Ordinances in the future. McDonald, on the other hand, easily satisfies the elements of a permanent injunction—which (again) are: "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public

---

tailored, we need not consider whether the Act leaves open ample alternative channels of communication.").

[21] The Plaintiffs have mounted *both* a facial *and* an as-applied challenge to the Hand-to-Hand Transmission Clause. *See, e.g.*, Complaint at 12 (seeking "[a] declaration that [the Panhandling Ordinance and the Right-of-Way Ordinance] violate the First Amendment of the U.S. Constitution facially and as applied to Plaintiffs"). We recognize that facial challenges are "discouraged," *Sabri v. United States*, 541 U.S. 600, 609 (2004), and that they will succeed only when a plaintiff can "establish that no set of circumstances exists under which the [statute] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987). This "*Salerno* rule," however, "is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). Which is all in the way of saying that the Hand-to-Hand Transmission Clause is facially unconstitutional because it "fails the relevant constitutional test," *ibid.—i.e.*, because the City hasn't shown that it's narrowly tailored to achieve a significant governmental interest.

interest would not be disserved by a permanent injunction." *Miami Mushroom*, 2021 WL 2823266, at *9 (cleaned up). We address each in turn.

*First*, it's well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) ("*KH Outdoor I*") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Cate v. Oldham*, 707 F.2d 1176, 1188–89 (11th Cir. 1983) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." (cleaned up)). Indeed, as we've suggested, McDonald may feel this "chilling" effect more acutely than most because he's staked his livelihood to the outcome of this case. Recall that McDonald doesn't panhandle for fun; he canvasses the streets because it's his only means of subsistence. Preventing him from collecting the donations he may need to survive is precisely what the law means when it speaks of "irreparable injury."

*Second*—and relatedly—money damages cannot compensate McDonald for his injuries. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("[C]hilled free speech and invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole."); *see also Cate*, 707 F.2d at 1189 ("One reason for such stringent protection of First Amendment rights certainly is the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." (cleaned up)). Here, McDonald has shown that "[t]he ongoing threat of arrest has had a chilling effect on [his] exercise of his First Amendment rights in the City of Fort Lauderdale." Complaint ¶ 46. McDonald's free-speech rights have been abridged by the Hand-to-Hand Transmission Clause, and "his injury" cannot be cured—at least not prospectively—by money damages.

*Third and fourth*, the harm from the threatened injury outweighs any harm to the public interest. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). A temporary infringement of First Amendment rights "constitutes a serious and substantial injury," whereas "the public, when the state is a party asserting harm, has *no interest* in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (emphasis added). Enforcing unconstitutional laws not only wastes valuable public resources; it "disserves" the public interest. *Id.* at 1293; *see also Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020) ("The nonmovant is the government, so the third and fourth requirements—'damage to the opposing party' and 'public interest'—can be consolidated. It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance."); *KH Outdoor I*, 458 F.3d at 1272–73 ("As for the third requirement for injunctive relief, the threatened injury to the plaintiff clearly outweighs whatever damage the injunction may cause the city . . . [because] the city has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance.").

Having thus concluded that McDonald has met all four elements of a permanent injunction, we **ENTER** that injunction here.

## 2.  Money Damages

The Plaintiffs are also "seeking damages for Mr. Messina and Mr. McDonald's being deterred from panhandling, not only as to the hand-to-hand transmission, but as this Court found based on the city's concession, the sign - - provision (d) of 25-267, the sign provision was unconstitutional." Trial Tr. at 20:12–16. But they've given us no reasonable metric for doing that.

"[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *accord Wright v. Sheppard*, 919 F.2d 665,

669 (11th Cir. 1990). "[T]he Supreme Court [has] held that compensatory damages under § 1983 may be awarded only based on *actual injuries* caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated." *Slicker v. Jackson*, 215 F.3d 1225, 1229 (11th Cir. 2000) (first citing *Carey v. Piphus*, 435 U.S. 247, 264 (1978); and then citing *Stachura*, 477 U.S. at 309–10). And those losses may include any "monetary loss" resulting from the violation. *Id.* at 1231.

As the Eleventh Circuit noted in *Slicker*, "[t]he Supreme Court held [in *Stachura*] that the district court's instruction" to the jury that it could award damages "based on the value or importance of the constitutional rights that were violated" was "erroneous under the rule that [the Court] set forth in *Carey* that § 1983 damages should be based on *actual* injuries suffered and that the abstract value of a constitutional right may not form the basis for § 1983 damages." *Id.* at 1230 (citing *Stachura*, 477 U.S. at 310). So, "[a]lthough compensable damages must be proven, general compensatory damages, as opposed to special damages, need not be proved with a high degree of specificity. Compensatory damages may be inferred from the circumstances as well as proved by testimony." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999) (cleaned up). At the same time, a plaintiff "must still give the [factfinder] an 'adequate yardstick' by which to calculate its 'lost profits.'" *Matrix Health Grp. v. Sowersby*, 2019 WL 4929917, at *8 (S.D. Fla. Oct. 7, 2019) (Altman, J.) (quoting *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1218 (11th Cir. 2006)); *see also Yeager v. Advanced Disposal Servs. Ala. LLC*, 2022 WL 17998532, at *6 (11th Cir. Dec. 30, 2022) ("The jury's assessment of damages cannot be based on speculation or conjecture, though nominal damages may be awarded where injury is shown but no measurable losses can be proved." (cleaned up)). And the Eleventh Circuit's Pattern Jury Instruction for damages in § 1983 cases emphasizes that damages for constitutional violations must be reasonable—and cannot be based on speculation or guess work: "You should assess," the instruction admonishes jurors, "the monetary amount that a preponderance of the evidence justifies as full and

reasonable compensation for all of [the plaintiff's] damages—no more, no less. You must not impose or increase these compensatory damages to punish or penalize [the defendant]. *And you must not base these compensatory damages on speculation or guess work.*" Eleventh Circuit Pattern Jury Instructions (Civil Cases) § 5.13 (2022) (emphasis added).

When a plaintiff "fails to present evidence of compensable injury," we may award "nominal damages[.]" *Slicker*, 215 F.3d at 1232; *see also ibid.* ("[A]n award of nominal damages may be appropriate when the plaintiff's injuries have no monetary value or *when they are not quantifiable with reasonable certainty.*" (emphasis added)). "Moreover, although the Supreme Court's decision in *Carey* involved nominal damages after a procedural due process violation, nominal damages are similarly appropriate in the context of a First Amendment violation." *KH Outdoor, LLC v. City of Trussville*, 465 F.3d 1256, 1261 (11th Cir. 2006) ("*KH Outdoor II*") (first citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980); and then citing *Risdal v. Halford*, 209 F.3d 1071, 1072 (8th Cir. 2000)).

The Plaintiffs have fallen well short of giving us the information we need to quantify their damages with "reasonable certainty." In support of their damages requests, both Plaintiffs submitted only their own vague, inconclusive, and mostly speculative testimony about how much they *might've* earned on an average day—without any explanation of how much they were deterred from earning or (just as significant) the extent to which they were able to mitigate their losses by panhandling in *other* cities. We anticipated this problem early on in the trial. *See* Trial Tr. at 25:12–14 ("[A]s to that issue, Mr. Burke - - and you heard me asking questions about damages calculations, which I think will be not so easy[.]"). And, unfortunately, the Plaintiffs did nothing to assuage our concerns.

McDonald, for instance, would often panhandle in *other* cities. *See* Trial Tr. at 57:15–19 ("Q. Okay. But you did, though, continue to panhandle both in Fort Lauderdale, Pompano, [and] Oakland Park, did you not? A. I would go to - - I would go to Pompano - - this was before I got arrested and after I got arrested, I would go to Pompano maybe once, twice a week. Q. Okay. After you got arrested,

you'd go to Pompano once or twice a week. . . . And you go to Oakland Park as well. A. I - -watchacallit - - I go to Oakland Park."). And he alternated between cities in this way from "October of 2017 [when McDonald started panhandling] up until when Judge Altman entered the injunction in this case[.]" *Id.* at 58:2–5. Sometimes, he would make even more money (or almost as much money) in those other places as he would've earned in the City. *See id.* at 48:23–49:2 ("Q. All right. And did you make more or less money in Fort Lauderdale than you did in Pompano? . . . A. I made less money here in Fort Lauderdale than in Pompano."). Without any understanding of how often he was forced to leave the City by the Ordinances—or how much he earned in those other municipalities—we have no way (years after the fact) of reasonably calculating his losses. We highlighted this issue at trial as well: "And all the evidence was . . . that he panhandled in Pompano and Fort Lauderdale. So, the only assumption I can draw from the evidence, I think, is on the days that he was thwarted in Fort Lauderdale, he just went to Pompano and made more money." Trial Tr. at 128:25–129:4.

True, McDonald did testify that, while panhandling in the City, he would "make approximately . . . $30 to $40" per day, *id.* at 48:22—roughly "one to three times out of the week," *id.* at 49:5. And he did say that the Ordinances forced him to "cut back in Fort Lauderdale[.]" *Id.* at 49:16–17. But he never told us *how much* he "cut back." He didn't, for instance, explain whether, on the days he was forced out of the City, he went somewhere else—or whether, instead, he simply earned nothing. At one point during the trial, in fact, Plaintiff's counsel conceded that this was a problem. Here's that exchange:

> THE COURT: But that's what I'm saying. Let's say you were making 50 bucks in Pompano. And on the day of, you get thwarted by police and you leave, you go and you start making 30 bucks in Fort Lauderdale.
>
> MR. TASEFF: Loss of 20.
>
> THE COURT: Let's say loss of 20. Then you go and you get sent away by the police, and you go back to Pompano, you made 50 bucks. Now there is no damage.

> MR. TASEFF: If, in fact, he goes back to Pompano at that time.
>
> THE COURT: We don't know that. And all the evidence was, was that he panhandled in Pompano and Fort Lauderdale. *So the only assumption I can draw from the evidence, I think is on the days that he was thwarted in Fort Lauderdale, he just went to Pompano and made more money.*
>
> MR. TASEFF: *I think that's one inference.* I think the other inference is, is that he did not go to Pompano because of the fact that - -
>
> THE COURT: Well, he couldn't have done nothing or else he would have died of starvation. And he's here, so . . . .
>
> MR. TASEFF: Well, I think tragically, yes, there are many days when he did nothing and lived off very little.
>
> THE COURT: But there are days when he did go panhandle. And where did he do that? He went to Pompano.
>
> MR. TASEFF: Correct[.]

*Id.* at 128:14–129:14 (emphases added). Even if there were evidence for Plaintiffs' counsel's view that "there are many days when [McDonald] did nothing and lived off very little"—there isn't any such evidence, by the way, which is reason enough to stop here—we have no way of calculating how many such days there were.

Nor did McDonald ever tell us *the extent to which* he reduced his panhandling because of the Hand-to-Hand Transmission Clause. McDonald suggested that he'd started panhandling "at least one to three times per week" after his 2018 arrest in Pompano. *See id.* at 49:2–5. And he *did* say that, after the Ordinances were promulgated, he cut that number back. *See id.* at 49:10–17. But he never told us *how much* he scaled back—and that reduced number is (of course) crucial to any reasonable computation of his damages. Here's how that part of his testimony went down:

> Q.   After your arrest in Pompano in August of 2018, how many times a week did you start to panhandle in Fort Lauderdale?
>
> A.   At least . . . At least one to three times out the week.
>
> Q.   Okay. Now, after you started panhandling more in Fort Lauderdale, did the police start to come by and tell you to stop?

A.      They would.

Q.      Okay. What would they do?

A.      They'll tell me, uh, I can't panhandle there. They say if they come back around, they're gonna take me to jail if I'm still around. So I leave.

Q.      All right. Why would you leave?

A.      I don't want to go to jail.

Q.      Did you cut back in Fort Lauderdale?

A.      Yes, I did.

Q.      Did you lose money?

A.      Come back, yes, I did.

*Id.* at 49:3–19.

We thus have no reasonable way of measuring his damages from when he started panhandling "in 2017 and into 2018," *id.* at 46:25–47:3, through the date of our preliminary-injunction order (June 23, 2021), when the City stopped enforcing the Ordinances against the Plaintiffs, *see id.* at 50:3–14 ("Q. Now, about four to five months after you filed the lawsuit against Fort Lauderdale, did the police back off? A. They did back off. Q. Do you know why? A. Because the judge . . . had let me know you can't be harassing people panhandling. . . . [A]fter the judge did that injunction, after the judge - - they backed up.").

Messina fared no better. In his deposition, he testified that a "good day" for him would be "80 to 100 [dollars] a day," Messina Dep. at 40:23–41:3, and "forty or fifty dollars would be a really bad day," *id.* at 41:6–7—and "some days . . . nothing," *id.* at 41:7. Now, Messina did say that he would "panhandle six days a week if [he] could without the harassment and the humiliation." *Id.* at 41:13–14. But (he added), because he was afraid of being arrested, he transitioned to panhandling only "two times" per week in the City. *Id.* at 60:11–13. Like McDonald, though, Messina admitted that he would

61

hop between different municipalities—including Fort Lauderdale, the City of Hollywood, and the City of Hallandale Beach. *See id.* at 61:8–11 ("I did a lot of mine in Hollywood, but they were so bad there that I would move to Fort Lauderdale and Hallandale because I've seen some real assault."); *see also id.* at 31:4–9 ("Q. Okay, where was the first placed you panhandled? A. I panhandled many places. Q. Do you remember where the first place was though, the first time you did it? A. Hollywood, Hallandale, and Fort Lauderdale."). And Messina never gave us a breakdown between the "good days" and the "bad days," and he never explained how often he panhandled in the City (versus these other municipalities). Nor did he ever say whether, when he would leave the City, he would mitigate his damages in these other places—and, if so, by how much. We thus have no adequate yardstick for computing his damages, either.[22] And it was indisputably his burden to "present evidence of compensable injury." *Slicker*, 215 F.3d at 1232. Having failed to meet their burden, the Plaintiffs now ask us to engage in precisely the kind of "speculation or guess work"[23] we caution our juries to avoid. We cannot—and will not—do that.

In these circumstances, courts haven't hesitated to award a plaintiff only nominal damages. *See KH Outdoor II*, 465 F.3d at 1261 ("[N]ominal damages are . . . appropriate in the context of a First Amendment violation."); *see also Slicker*, 215 F.3d at 1232 ("[A]n award of nominal damages may be appropriate when the plaintiff's injuries have no monetary value or *when they are not quantifiable with reasonable certainty.*" (emphasis added)). And that's what we've decided to award our Plaintiffs here.

## CONCLUSION

After a careful review of all the evidence, therefore, we hereby **ORDER AND ADJUDGE** as follows:

---

[22] For this same reason, even if we'd determined that Messina had standing to challenge the Panhandling Ordinance, we would've awarded him only nominal damages for that law's infringement of his constitutional rights.

[23] *See* Eleventh Circuit Pattern Jury Instructions (Civil Case) § 5.13 (2018).

1. Count I of the Plaintiffs' Complaint is **DISMISSED** for lack of standing.

2. As to Count II:

   a. Final Judgment is **ENTERED** in favor of the Plaintiffs, Bernard McDonald and Mark Messina, and against the Defendant, the City of Fort Lauderdale.

   b. The Hand-to-Hand Transmission Clause of the Right-of-Way Ordinance (§ 25-267) is **DECLARED** unconstitutional.[24]

   c. The Defendant, the City of Fort Lauderdale, is permanently **ENJOINED** from enforcing the Hand-to-Hand Transmission Clause.

   d. The Plaintiffs are each awarded nominal damages in the amount of $1.00.

3. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter final judgment separately.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**. This case shall remain **CLOSED**.

**DONE AND ORDERED** in the Southern District of Florida on January 25, 2024.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record

---

[24] We've already declared the other challenged aspects of the Right-of-Way Ordinance unconstitutional and enjoined the City from enforcing them. *See* MSJ Order at 2–3. So, we see no need to reiterate those holdings here.